# CASES

ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

## SWARTS v. FOURTH NAT. BANK OF ST. LOUIS.

(Circuit Court of Appeals, Eighth Circuit. July 21, 1902.)

### No. 1,695.

1. BANKRUPTCY—PREFERENCE—DEFINITION.

Section 60a furnishes the legal and controlling definition of the preference specified in section 57g and other parts of the bankrupt act of 1898.

2. SAME—TEST.

The test of a preference is the payment, out of the bankrupt's estate, of a larger percentage of the claim of a creditor than other creditors of the same class receive from that estate, and it is not whether or not, in view of the obligations of sureties to pay the claim, the payment benefited the preferred creditor.

3. SAME—PAYMENT ON INDORSED NOTES CONSTITUTES.

Payments by the bankrupt, while insolvent, within four months prior to the filing of the petition in bankruptcy against him, upon his indorsed notes, which the indorsers would have paid if he had not, constitute a preference, whether the creditor preferred derived any benefit from these payments or not.

4. SAME—SURRENDER.

A creditor who has several claims of the same class, upon one of which he has received a preference, must surrender the preference before any of his claims can be allowed.

5. SAME—STATUS AT DATE OF FILING PETITION FIXES CREDITORS' RIGHTS.

The status of their claims at the time of the filing of the petition in bankruptcy fixes the rights of the creditors to share in the estate of the bankrupt, under the bankrupt act of 1898.

6. SAME—CLASSES OF CREDITORS.

The meaning of the term "class" in the bankrupt act should be derived, and the classification of creditors thereunder should be made, from the provisions of that act.

7. SAME—TEST OF CLASSIFICATION OF CREDITORS.

The test of the classification of creditors under the bankrupt act of 1898 is the percentage of their claims they are entitled to draw out of the estate of the bankrupt, and not the relations of the creditors to parties other than the bankrupt. If they are entitled to receive the same percentage, they are in the same class; if different percentages, in different classes.

---

¶ 4. See Bankruptcy, vol. 6, Cent. Dig. § 500.

**8. SAME—CREDITORS WITH AND WITHOUT PERSONAL SECURITY IN SAME CLASS.**

Creditors whose claims are secured by the indorsement or guaranty of one or more third persons are in the same class as those whose claims are not thus secured, when they are entitled to draw out of the bankrupt estate the same percentage on their claims.

**9. SAME—PREFERENCE—CLASSES.**

A bank which held two series of notes of a bankrupt, one for $35,000, secured by two insolvent accommodation makers, and one for $25,000, secured by four accommodation makers, some of whom were solvent, received payments on the latter series, to the amount of $14,600, from the bankrupt while he was insolvent, and within four months of the filing of the petition in bankruptcy against him. *Held*, the bank was in the same class of creditors as holder of the second series of notes as it was as holder of the first series, and its claim, based upon the first series, was not allowable unless it surrendered the preference it received by the payments upon the second series.

**10. SAME—DISQUALIFICATION OF CLAIM BY PREFERENCE.**

The disqualification of a claim for allowance created by a preference inheres in, and follows every part of, the claim, whether retained by the creditor or transferred to another, until the preference is surrendered. After the bank had received the $14,600 on the notes for $25,000, the solvent accommodation makers paid the balance remaining due upon them. *Held*, both the accommodation makers' claim for the $10,400, and interest, which they paid, and the bank's claim for the $35,000, were disqualified for allowance until the $14,600 was surrendered to the trustee of the bankrupt estate.

**11. SAME—PREFERENCE—SURRENDER.**

If the bank surrenders the $14,600, it will become entitled to the allowance of its claim for $60,000 in full, and the solvent accommodation makers will be entitled to the allowance of no claim for the $10,400 and interest which they have paid.

**12. SAME—SURETIES—DISCHARGE—ACCEPTANCE FROM THEIR PRINCIPAL AND SUBSEQUENT SURRENDER BY THEIR CREDITOR OF A PREFERENCE DO NOT DISCHARGE SURETIES.**

Accommodation makers, indorsers, or sureties upon the obligations of an insolvent debtor are not discharged from liability to pay them by the innocent acceptance, by their creditor, of payments thereon by the debtor, which the creditor is subsequently required to, and does, surrender to the latter's trustee in bankruptcy as a condition of the allowance of its claim under section 57g of the bankrupt act of 1898.

**13. SAME—CREDITOR HOLDING CLAIM PARTLY PAID BY SURETY MAY PROVE IN FULL.**

A creditor who holds the obligations of a bankrupt which have been partly paid by an accommodation maker, an indorser, or a surety, may prove and have his claim allowed, against the estate of the bankrupt, for the full amount owing by the bankrupt on the obligations. If the dividends on those obligations, plus the amount previously paid by the surety, amount to more than the obligations, the creditor will hold the surplus in trust for the surety.

(Syllabus by the Court.)

Appeal from the District Court of the United States for the Eastern District of Missouri.

On February 6, 1900, the Siegel-Hillman Dry Goods Company, a corporation, was adjudged a bankrupt on the petition of its creditors, which was filed on December 30, 1899. Four months before the filing of the petition, the Fourth National Bank of St. Louis held a claim of $60,000 against this corporation, which was evidenced by a series of promissory notes signed by the company, and indorsed by H. A. Loeb and B. Hillman, which amounted to $35,000, and by another series of promissory notes signed by the corporation, and indorsed by H. A. Loeb, B. Hillman, L. Regenstein, and F. Siegel

& Bro., which aggregated $25,000. All the indorsements were placed upon these notes before they were discounted for the accommodation of the corporation, and for the purpose of giving credit to the notes, so that the indorsers stood in the relation of makers to the bank, and of accommodation makers or sureties to the dry goods company. Within four months preceding the filing of the petition in bankruptcy, the dry goods company, while it was insolvent, paid to the bank, which did not have reasonable cause to believe that it was intended thereby to give a preference, the sum of $14,600 upon some of the notes which were indorsed by Siegel & Bro. On February 21, 1900, Siegel & Bro. paid the $10,400 and interest which remained unpaid upon the notes which they had indorsed, and subsequently proved up this payment as a claim against the estate of the bankrupt. The bank proved its claim against the bankrupt's estate for $35,000 and interest, based upon the notes which had been indorsed by Loeb and Hillman, but which did not bear the names of Regenstein or Siegel & Bro. The trustee moved to expunge the claim of the bank unless it surrendered the $14,600 which it had received from the estate of the bankrupt within four months preceding the filing of the petition. The referee granted the motion. The district court reversed this decision, and directed the referee to deny the motion. From the decree to this effect, the trustee has appealed to this court.

David Goldsmith (A. L. Abbott, on the brief), for appellant.

Lee Sale (M. N. Sale, on the brief), for appellee.

Before SANBORN and THAYER, Circuit Judges, and LOCHREN, District Judge.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

May a creditor of a bankrupt whose claim is evidenced by numerous promissory notes secured by different indorsers or accommodation makers accept from the insolvent, within four months of the filing of the petition in bankruptcy against him, payment in part of the notes secured by the solvent indorsers, and then obtain the allowance of that portion of his claim against the bankrupt upon which the solvent indorsers were not liable, without a surrender of the payment he has thus obtained? This is the primary question which this case presents.

No one can become familiar with the bankrupt law of 1898 without a settled conviction that the two dominant purposes of the framers of that act were: (1) The protection and discharge of the bankrupt; and (2) the distribution of the unexempt property which the bankrupt owned four months before the filing of the petition in bankruptcy against him, share and share alike, among his creditors. All the earlier sections of the act are devoted to the security and relief of the bankrupt, and, when the distribution of his property is reached, the provisions relating to it are all drawn from the standpoint of the insolvent, and not from that of his creditors. The rights and privileges of the bankrupt, and the equal distribution of his property, dominate every provision, while the rights, wrongs, benefits, and injuries of his creditors are always incidental, and secondary to these controlling purposes. Section 60a contains the legal and controlling definition of the preference specified in section 57g and the other parts of the bankrupt act. 30 Stat. c. 541, pp. 562, 560; Kimball v. E. A. Rosenham Co. (C. C. A.) 114 Fed. 85, 7 Am. Bankr. R. 718, 719; Pirie v. Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171. But this definition of

a preference was not written from the station of the creditor, but from that of the debtor. It is not the act of the creditor, but the act of the debtor, which gives it,—which produces it. The controlling thought is not the benefit or injury to the creditor, but the equal distribution of the property of the bankrupt among the holders of the provable claims against him.

It is contended that there was no preference by the payment by the bankrupt of the $14,600 to the bank on the notes of its solvent indorsers, because the bank derived no benefit therefrom. It is said that the bank would have received the full payment of these notes from the indorsers of the bankrupt if nothing had been paid upon them by the corporation. The argument assumes a fact which does not really exist, for the presumption always is that cash in hand is more valuable and useful than the legal liability of any party to pay it. But, if the bank had derived no benefit from this payment, its legal effect would not have been different. When the authors of paragraph 60a prepared the legal definition of a preference, they were neither considering nor dealing with the promises, liabilities, payments, or acts of others than the bankrupt. They were treating of his property, and of the claims of his creditors against that property. The dominant purpose of the prohibition of a preference was not to benefit or injure, or to prevent the benefit or injury, of any creditor or class of creditors, but to prevent the debtor from making any disposition of his property which would prevent its equal distribution,—to prevent him from doing anything which would result in the payment out of his property of a larger percentage upon any claim than others of the same class would receive. The plain intention of congress, and the legal effect of the paragraph, were to make every transfer of any of the insolvent's property, by means of which a larger percentage would be paid out of his estate to any creditor, or on any claim, than every other creditor and every other claim of the same class would receive, a preference to be surrendered or avoided under the other provisions of the statute. The meaning and effect of section 60a are the same as though it declared every transfer of his property by an insolvent to be a preference which has the effect to "enable any one of his creditors to obtain a greater percentage of his debt" out of the property of the insolvent "than any other of such creditors of the same class." The test of a preference, under the act, is the payment, out of the bankrupt's property, of a larger percentage of the creditor's claim than other creditors of the same class receive, and not the benefit or injury to the creditor preferred. Marshall v. Lamb, 5 Q. B. 115, 126, 127.

Four months before the filing of the petition in bankruptcy, the bank had a claim against the estate of the insolvent for $60,000. Within that four months, it received $14,600 out of his estate, so that, when the petition in bankruptcy was filed, instead of a claim for $60,000 against the insolvent, it held $14,600 of his money, and a claim against him for $45,400. The statement of these facts is itself a demonstration that if the bank can retain this money, and procure the allowance of the balance of its claim, it will receive a greater percentage of its debt out of the estate of the insolvent than other creditors of the same class who receive no such payments. The insolvent has in-

creased the funds of the bank $14,600, and it has diminished by $14,600 the property to be distributed among its creditors; and it is the depletion of the estate, to pay a larger percentage upon one claim against it than others of the same class will receive, against which the provisions of section 60a and section 57g are specifically leveled. The conclusion is irresistible that the payment to the bank of the $14,600 gave it a preference over the other creditors of the bankrupt of the same class.

It is, however, strenuously argued that, if the payment of this $14,600 created a preference, the bank should not be required to surrender it, because, after the adjudication in bankruptcy, Siegel & Bro., the solvent indorsers, paid the $10,400 remaining unpaid on the notes which they had indorsed, and proved this payment as a part of their claim against the estate of the bankrupt, while the claim which the bank has presented consists entirely of notes upon which Siegel & Bro. are not indorsers. But how does the fact that, since the filing of the petition in bankruptcy, the bank has assigned a portion of its claim to Siegel & Bro., by operation of law or otherwise, relieve it from its disability to prove any of its claim until it surrenders its preference? The bankrupt act prohibits the allowance of any claim of a creditor who has received a preference unless he has surrendered that preference. "The claims of creditors who have received preferences shall not be allowed unless such creditors shall surrender their preferences." Section 57g. The unequivocal language and the unquestionable legal effect of this section are to prohibit the allowance of any claim of a creditor who has received a preference, either upon that or upon any other claim he holds against the estate of the bankrupt, unless he has first surrendered his preference. Strobel & Wilken Co. v. Knost (D. C.) 99 Fed. 409; Electric Corp. v. Worden, 39 C. C. A. 582, 99 Fed. 400; In re Conhaim (D. C.) 97 Fed. 924; In re Rogers Milling Co. (D. C.) 102 Fed. 687; Collier, Bankr. (3d Ed.) pp. 318, 319.

Under the act of 1898, the rights of claimants to share in the distribution of the estate of the bankrupt are fixed by the status of their claims at the time of the filing of the petition in bankruptcy. Section 63; In re Bingham (D. C.) 94 Fed. 796. The petition in this case was filed on December 30, 1899. At that time the bank held a claim against the estate of the dry goods company for $45,400, $35,000 of which was evidenced by the notes of the bankrupt indorsed by Loeb and Hillman, while $10,400 was evidenced by the notes of the bankrupt indorsed by Loeb, Hillman, Regenstein, and Siegel & Bro. Siegel & Bro. were the only solvent indorsers. Our attention is here challenged to a late decision of the circuit court of appeals for the Seventh circuit in Doyle v. Bank, 24 Nat. Corp. Rep. 406, 116 Fed. 295, in which it is held that a creditor who holds a promissory note of the bankrupt, secured by an indorser, is in a different class from one who holds the bankrupt's note without any indorser, within the meaning of paragraph 60a, so that the bankrupt may pay the former's note without creating any preference which must be surrendered by the creditor before his claim based upon the unindorsed note can be allowed. This decision is cited to support the position that the bank

is in a different class with its claim upon the $35,000, from that in which it is with its claim for $10,400. It must be conceded that, if a creditor holding the bankrupt's note with no indorser is in a different class from one holding it with one indorser, one holding his note with two indorsers must be in a different class from either of the others, because the third note is marked by exactly the same difference from the second note as the second is from the first, the difference of one indorser,—while the difference between the first note and the third note is twice as great. Nor, if it be conceded that a creditor with one indorser is in a different class from one with no indorser, can it be successfully contended that a creditor with four indorsers, some of whom, are solvent, as is the case in respect to the $10,400 here in question, is in a different class from one with two indorsers who are insolvent, as in the case of the notes for $35,000 under consideration. The character of the court which rendered this decision, the learning and ability of the judges who compose it, and the great respect its opinions always command, have impelled us to a careful consideration of the conclusion it announces, and of the opinion which supports it. But their logical effect is to create such a multitude of classes of creditors, to so confuse the administration of that portion of the bankrupt law which treats of preferences, and to open so plain a way to the nullification of paragraph 57g of the bankrupt act, that we hesitate to follow them. If a debtor may pay his indorsed paper within four months of the filing of the petition in bankruptcy against him, without creating a preference of the creditor so paid, that will bar the allowance of his claim on open account or on unindorsed paper, the way to payments and transfers by a bankrupt which will actually prefer creditors, but which will not fall under the ban of the bankrupt law, is plain and smooth. All that the debtor needs to do, to evade the provisions of this act for the surrender of preferences, is to give indorsed paper for the part of his debts which he proposes to pay, and the creditor may then receive the actual, and escape the legal, preference with impunity. We are not yet prepared to adopt a rule fraught with such consequences.

While it is true that the bankrupt act does not define the word "class," nor in terms state what creditors are in the same class, it creates some classes, and specifies others, and it seems to us that the meaning of the word "class" in the act should, if possible, be derived from the statute itself. Section 64, after directing the payment of certain expenses of administration, creates three classes of creditors,—parties to whom taxes are owing, employés holding claims for certain wages, and those who, by the laws of the states or of the United States, are entitled to priority. Sections 56b, 57e, and 57h provide for the treatment and disposition of claims secured by property, and of claims which have priority. The creditors who hold these various claims, and the general creditors of the estate, constitute the classes of creditors of which the bankrupt act treats. Now, if any one of these various classes is taken by itself and examined, it will be seen that each one of the creditors in the same class always receives the same percentage upon his claim, out of the estate of the bankrupt, that every other creditor of his class receives. Where the estate is insuf-

ficient to pay the claims of different classes in full, the classes receive, out of the bankrupt estate, different percentages of their claims, but creditors of the same class receive the same percentage. The test of classification is the percentage paid upon the claims out of the estate of the bankrupt.

Here, again, in considering this question of classification, it is well to bear in mind that this act was drawn from the station of the bankrupt, and that its primary purposes were to relieve the bankrupt, and to distribute his property equally among his creditors. The test of a preference, as we have seen, is whether or not a transfer or payment will have the effect to pay on one claim a larger dividend, out of the estate of the bankrupt than that estate will pay on other claims of the same class. It is its effect upon the equal distribution of the estate of the bankrupt, not its effect upon the creditor, that determines the preference. The same dominant thought controls and determines the classification of the creditors. Those creditors who are entitled to receive out of the estate of the bankrupt the same percentage of their claims are in the same class, however much their owners may have the right to collect from others than the bankrupt. Their relations to third parties, their right to collect of others, the personal security they may have through indorsements or guaranties, receive no consideration, no thought. It is the relation of their claims to the estate of the bankrupt, the percentages their claims are entitled to draw out of the estate of the bankrupt, and these alone, that dictate the relations of the creditors to the estate, and fix their classification and their preferences.

Now take the case in hand, or the simpler case of a creditor who has one of the bankrupt's notes with a solvent indorser and another without any indorser. He is entitled to receive the same percentage out of the estate of the bankrupt on his indorsed note that he is on that which is not indorsed. It is true that he has the right to collect the former of the indorser. But, if he does, the indorser may prove the note, and receive exactly the same percentage upon the claim that the original creditor would receive upon the note which was not indorsed. Section 57i. The two notes bear exactly the same relation to the estate of the bankrupt whether indorsed or not,—whether paid by the indorser or not,—and for this reason they and their holders stand in the same class. They are in the same class because it is the relation of the creditors, and their claims to the estate of the bankrupt, and not their relation to third parties, that determines their rights, and fixes their status, under the bankrupt act of 1898. We are not persuaded that a creditor who holds an indorsed note of a bankrupt is in a different class from one who holds his note without an indorsement, under section 60a of the bankrupt act, because the legal result of such a conclusion would lead to the creation of new and numerous classes of creditors not specified in the bankrupt act; because that conclusion would open a plain way to evade the provisions of section 57g; because the definition of the term "class" as used in the bankrupt act should be derived from that statute itself; and because the true test of the classification of creditors under that act is the percentage which, in the absence of preferences,

their claims are entitled to draw out of the estate of the bankrupt, and the holder of an unindorsed note is entitled to the same percentage from the estate as the holder of an indorsed note. Creditors who, in the absence of preferences, are entitled to receive the same percentage upon their claims out of the estate of the bankrupt, are members of the same class. Those who are entitled to different percentages are of different classes. The result is that the bank as holder of the notes for $10,400, upon which there were four indorsers, was in the same class as it was as the holder of the notes for $35,000, on which there were but two indorsers. On December 30, 1899, it had received a preference of $14,600, and it was forbidden to prove any part of its claim until it surrendered this preference.

These facts fastened upon the entire claim of the bank an attribute of disqualification for allowance. The ban of the statute was upon the claim. The act declares that the claims of creditors who have received preferences shall not be allowed unless the creditors surrender their preferences. This disqualification inheres in every part, every dollar, of the claim of the bank. The holder of this claim could not qualify it for allowance by transferring the whole or a part of it to another, nor could Siegel & Bro. accomplish this result by paying the notes on which they were indorsers, and becoming their owners by subrogation. Every part of the claim, whether retained by the bank or assigned to another, remained, and will remain, disqualified for allowance until the $14,600 whose payment constitutes the preference is surrendered. The claim of the bank, therefore, must be expunged unless it repays to the trustee the $14,600 which it received from the insolvent within four months prior to the filing of the petition in bankruptcy.

The next question is what is the amount of the claim which may be allowed to the bank if it surrenders the $14,600? It is conceded that it may prove its $35,000, and the $14,600 which it received on the notes for $25,000, and repays to the trustee. May it also prove, and receive a dividend on, the $10,400 that remained unpaid by the bankrupt, but which was subsequently paid by the indorsers, Siegel & Bro.? Before anything was paid on the notes for $25,000 indorsed by Siegel & Bro., the latter were sureties for their payment by the bankrupt. Their contract was that they would pay them if their principal did not. If they had paid them, they could have recovered their amount from their principal, or could have proved them against his estate. Section 57i. But the contract of the sureties was that the bank should first be paid before they should receive anything from the principal debtor. When this contract was made, the bankrupt act of 1898 was in effect, and the provisions of that act, so far as they were material to the obligations of the parties, became a part of their agreement. That statute provided that a preference given to a creditor by an insolvent within four months of the filing of the petition in bankruptcy against him should bar the allowance of any claim of the preferred creditor unless he surrendered his preference. The act did not either directly or inferentially forbid the creditor to accept the preference, when, as in the case at bar, he had no reasonable cause to believe that the transfer was intended to give a preference. The statute

permitted the giving and the receiving of the preference, and gave the creditor the option to return it, and secure the allowance of his claim, or to retain it, and forego the dividend from the bankrupt's estate. The receipt of the preference by the creditor was, therefore, neither malum prohibitum nor malum in se. In this state of the law and of their contract, the principal debtor, before the adjudication in bankruptcy, gave to the bank a preference by the payment of $14,600 on the notes upon which Siegel & Bro. were accommodation makers, and after the adjudication the accommodation makers paid the balance due, $10,400, and interest. Assuming that the bank pays the $14,600 back to the trustee, does the claim against the bankrupt estate for the $10,400 and interest, and the prospective dividend upon it, belong to the bank or to the indorsers, Siegel & Bro.? This question involves another: Will the receipt of the $14,600 by the bank, and its subsequent return to the bankrupt estate, release the accommodation makers, Siegel & Bro., from their liability to pay the bank this $14,600 upon the notes?

Under the bankrupt law of 1867, no legal or permissible preference was required to be surrendered either absolutely or conditionally. Every preference which fell under the ban of that statute was a fraudulent preference, and every creditor who received and retained such a preference forfeited his right to prove his claim, although the assignee recovered back the money or property thus transferred. 14 Stat. 534, § 35; Cookingham v. Morgan, Fed. Cas. No. 3,183; Curran v. Munger, Fed. Cas. No. 3,487; Fairbanks v. Bank (C. C.) 38 Fed. 630, 634. In Bartholow v. Bean, 18 Wall. 635, 641, 642, 21 L. Ed. 866, the question was whether the payment, by an insolvent, to the payee, who knew of the insolvency of the payor, of an overdue promissory note, on which there was a solvent indorser whose liability had been fixed, constituted a fraudulent preference under the act of 1867. The supreme court declared that that act expressly forbade the creditor to receive such a payment, that its receipt constituted a fraud, and that the assignees were entitled to recover back the amount so paid. This was the only question at issue, and the only question decided in that case. But there is a dictum of Mr. Justice Miller near the close of the opinion in Bartholow v. Bean, thrown in by way of argument, in these words: "While by receiving the money the holder of the note makes himself liable to a judgment for the amount in favor of the bankrupt's assignee, and loses his right to recover either of the indorser or of the bankrupt's estate,"—which seems to have led to a decision to the effect that the acceptance of such a payment by the creditor would discharge the indorser or surety. The dictum is no authority for such a conclusion, or for any conclusion, because the question now under consideration was not before the supreme court in that case, and does not appear to have been either considered or decided. The case which follows, and rests upon this dictum, is In re Ayers, 6 Biss. 48, Fed. Cas. No. 685. It was a case in which the guarantors of a note, the original holder of which had forfeited his claim against the bankrupt's estate by accepting a fraudulent preference, were endeavoring to prove a claim based upon it. The court held: (1) That, as the claim on the note had been forfeited by the

original holder, it was forfeited by the guarantors also; and (2) that the latter had no claim based upon the note because the acceptance of the fraudulent preference discharged them from liability as sureties. There is another case in which Mr. Justice Miller's dictum seems to have had influence. It was decided by the supreme court of Kentucky, and is entitled Bank v. Cooke, 76 Ky. 340, 344. But that court held that the creditor might have accepted the preference, and still have held the surety liable if it had notified the surety of the offer by the debtor to make the payment, and had accepted it on the advice of the surety. These cases rest on the proposition that the acceptance of the preference discharged the sureties because it was a prohibited act,—a fraud upon the bankrupt law of 1867. No decision of this question under the bankrupt act of 1898 has been called to our attention. There is a sentence in the opinion of the circuit court of appeals in Doyle v. Bank, 24 Nat. Corp. Rep. 406, 116 Fed. 295, to the effect that the acceptance of a preference by the payment of an indorsed note by the maker would discharge the indorser, but it is a statement made arguendo, without citation of authorities, upon a question that was not before that court for decision, and it would not, we are confident, be considered either in that or in any other court a decisive ruling upon the question here at issue.

On the other hand, the supreme court of Iowa, in Watson v. Poague, 42 Iowa, 582, 583, announced what seems to be a more just and rational rule, and held that the receipt of a preference by a payment of an indorsed note, which was subsequently recovered by the assignee in bankruptcy, would not constitute a payment of the note or a release of the indorser. That court said: "It is true that the receiving of the payment under such circumstances is called, in the bankrupt act, accepting a fraudulent preference, but it was not an actual fraud, nor would it have been even a constructive fraud if an adjudication in bankruptcy had not taken place upon a petition filed within four months. Besides, whatever was done was not done with intent to wrong the defendants, but rather to protect them. If plaintiff had declined to receive the payment, especially if Griffith was insolvent, the defendants might justly have complained. There was at least a possibility that no adjudication in bankruptcy would take place upon a petition filed within four months. But it did take place, and now the plaintiff asks relief, not against his own fraud, but because the payment which he properly received has been held, by reason of what afterwards transpired, and under the peculiar provisions of the bankrupt law, to have been made to him in trust for all the creditors of Griffith. It is not impossible that the acceptance of a payment by a creditor from his bankrupt debtor might mislead a surety of the debtor to his injury, but that, we think, would be the surety's misfortune rather than a ground of defense in a case like this, where the creditor had acted in good faith towards the surety, and had been reasonably diligent to save him from loss. A surety cannot be discharged where the creditor is without fault."

In Pritchard v. Hitchcock, 6 Man. & G. 151, A. had guarantied the payment to B. of two bills of exchange accepted by C. C. afterwards paid the amount of the bills to B. The assignees in bankruptcy

of C. recovered the money from B. as a fraudulent preference. It was held that the payment did not satisfy the debt, and did not discharge the guarantor.

In Petty v. Cooke, L. R. 6 Q. B. 790, 794–796, the defendant Cooke, for the accommodation of Steele, signed a promissory note with him for 100 pounds, payable to the plaintiff. Steele paid it in contemplation of insolvency, and the plaintiff innocently accepted the amount. Afterwards, Steele's trustees in bankruptcy recovered back the amount which the plaintiff had received in payment of the note as a preference. The plaintiff then brought an action against the accommodation maker, Cooke, and he pleaded that the acceptance by the plaintiff of the payment which had been recovered back had discharged him from liability as a co-maker or surety. The court of Queen's bench held otherwise, and rendered judgment for the plaintiff. Judge Blackburn said: "Is there any case which says that an innocent act unconsciously done discharges the surety? * * * The creditor accepted the money, which he had no right to refuse, and the acceptance of which he had no means of knowing would injure the surety. He therefore did no act injurious to the surety, and the surety is not discharged." Judge Lush said: "I am of the same opinion. The rule of law and equity with regard to the rights of a surety is the same. I do not entertain the slightest doubt that the act of the creditor which discharges the surety must be an act involving something inequitable at the time it is done, and which interferes with the rights of a surety; an acceptance of money from the debtor, which the creditor thought at the time he accepted it was a good and valid payment, cannot, therefore, discharge the surety. The creditor, under present circumstances, could not have refused to accept the money; its acceptance was an advantage, not an injury, to the surety." Judge Hannen said: "I am also of the same opinion. Lord Eldon puts it that the surety is discharged when the creditor has done anything which is 'against the faith of his contract.' How can it be against the faith of his contract for the creditor to do that which it was his duty to do, namely, to receive payment? It turned out afterwards that the payment was not a good payment, and therefore the surety is not discharged."

These opinions are well grounded in reason, clear, and persuasive. They lead to just and equitable results, and they are exactly applicable to the facts of this case. The bank was guilty of no fraud or wrong when it accepted payment from the insolvent. The indorsers, as well as the bank, knew that any payments made upon the notes by the principal debtor were liable to be recalled as a condition of the allowance of the claim of the bank against its estate if the maker of the note was adjudged a bankrupt upon a petition filed within four months of the payments. Their contract was conditioned by this fact, and by the statute which called it into being. The acceptance of such payments was not forbidden by the moral or by the civil law. The bank did not know, and could not foresee, that the principal debtor on the note would become a bankrupt within four months from the payments. The holder of a surety's obligation may discharge it if he knowingly does any act to diminish his security or his oppor-

tunity to enforce it, or any act to increase his liability. But the acceptance of these payments did none of these things. A refusal to accept them might well have been held to be an act so likely to entail unnecessary loss upon the accommodation makers that it would discharge them. But the receipt of the money was an act of reasonable diligence,—an act in the rational discharge of the duty of the bank towards the sureties. It hoped and believed that the money it received would be a payment upon the debt. If it returns it, no payment has been made by the receipt of it. The debt remains unpaid because the money received turns out to be the property of the bankrupt estate, which the bank holds in trust for, and returns to, the estate under the law. The sureties are not discharged by the payment and satisfaction of any part of the notes, because no payment and satisfaction were effected. They are not discharged by any act or negligence of the creditor, because it has been guilty of none which either increased their liability or diminished their security or their opportunity to enforce it. The only just and equitable conclusion is that the accommodation makers, indorsers, or sureties upon the obligations of an insolvent debtor are not discharged from liability to pay them by the innocent acceptance, by their creditor, of payments thereon from the insolvent debtor which the creditor is subsequently required to, and does surrender to the latter's trustee in bankruptcy as a condition of the allowance of its claim under section 57g of the bankrupt act.

The result is that, when the bank returns the $14,600, it will be the owner of the notes for $25,000 indorsed by Siegel & Bro., and will be entitled to collect from the estate of the bankrupt, and from Siegel & Bro. the $14,600 and interest which will still be due to it upon the notes. The contract of Siegel & Bro. was that they would pay these notes if the bankrupt did not. By that contract they are estopped from collecting or receiving anything upon or on account of them from the bankrupt estate, which still owes the full amount of them, until the bank has received the $14,600 which is still due to it on the notes. In view of this state of the case, the bank may prove its claim, and that claim may be allowed for the full amount of the notes when it repays to the trustee the $14,600. It has, however, received $10,400 and interest upon them from Siegel & Bro. It is entitled to receive no more than the amount of the notes and interest. If, therefore, the $10,400, and the dividends it receives from the estate of the bankrupt upon these notes for $25,000, amount to more than the principal and interest of the notes, it will hold the surplus in trust for, and must pay it over to, Siegel & Bro.

A creditor who holds the obligations of a bankrupt which have been partly paid by an accommodation maker, an indorser, or a surety, may prove his claim, and have that claim allowed against the estate of the bankrupt for the full amount owing by the bankrupt upon the obligations, but if the dividends on that claim from the bankrupt estate, plus the amount paid by the surety, aggregate more than the entire amount of the obligations and interest, he holds the surplus in trust for the surety. In re Ellerhorst, 8 Fed. Cas. 522, 523 (No. 4,381); Ex parte Talcott, Fed. Cas. No. 13,184, 2 Low. 320, 323; In re Bingham (D. C.) 94 Fed. 796; In re Heyman (D. C.) 95 Fed. 800;

Collier, Bankr. (3d Ed.) p. 321; Bank v. Pierce, 137 N. Y. 444, 447, 33 N. E. 557, 20 L. R. A. 335, 33 Am. St. Rep. 751; In re Hollister (D. C.) 3 Fed. 452, 453; Downing v. Bank, 7 Fed. Cas. 1008, 1011 (No. 4,046).

The decree of the court below must be reversed, and the case must be remanded to that court with directions to make an order that the claim of the Fourth National Bank against the estate of Siegel-Hillman Dry Goods Company be expunged unless, by a day certain, it returns to the trustee the $14,600 which it received from the bankrupt, with directions to so fix that day that, if the bank refuses to return this money, an opportunity may be subsequently given to Siegel & Bro. to do so before their claim is disallowed, and with further directions to allow the claim of the bank for the full amount of the principal of all the notes, to wit, $60,000 and interest, in case it repays the $14,600, and to take such further proceedings not inconsistent with the views expressed in this opinion as may to the court seem meet and proper. It is so ordered.