In re ARMSTRONG.

(District Court, S. D. Iowa, W. D. April 7, 1906.)

No. 254.

1. BANKRUPTCY—VALIDITY OF LIENS—MORTGAGES GIVEN WITHIN FOUR
  MONTHS.
    The question whether or not a mortgage given by a bankrupt within four months prior to his bankruptcy, which was not fraudulent in fact, so as to bring it within the provisions of Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449], is void as a preference must be determined under the provisions of sections 60a and 60b, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445] as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 [U. S. Comp. St. Supp. 1905, p. 689], construed together.

2. SAME—EVIDENCE CONSIDERED.
    A bankrupt owned over 3,000 acres of land in Iowa, besides a valuable homestead and a large amount of personal property, in all worth over $200,000. He was extensively engaged in farming and dealing in stock, and had been for many years regarded as a man of wealth and high personal standing. Within four months prior to his bankruptcy a local private bank to which he owed nearly $100,000 and the owner of which was old and in poor health asked him to secure its claim by a mortgage which he did. He continued to do business with the bank and afterward became indebted to it on overdrafts for more than $5,000, which was later secured by another mortgage. After the first mortgage was given and recorded, another bank, to which he was indebted, asked security, and was given a mortgage in part on other property; the bankrupt at the time also furnishing a statement showing him to be worth, including his homestead, over $50,000, above all indebtedness. *Held,*

under the evidence that, while he was in fact insolvent when the mortgages were given, he did not believe himself to be so, but gave the mortgages in good faith, and without intention to give preferences; that neither of the mortgagees, when the first two mortgages were given knew, or had reasonable cause to believe that he was insolvent, and that such mortgages were valid liens, but that the overdraft mortgage given at a later date when his condition was better known was void, as a preference.

In Bankruptcy. On claims of William Arts and Thomas B. McPherson, mortgagees.

T. J. Mahoney, John N. Baldwin, George S. Wright, J. P. Conner, P. E. C. Lally, and George H. Mayne, for claimants.

J. L. Kennedy, M. L. Learned, and George W. Paine, for the trustee.

McPHERSON, District Judge. Alexander Armstrong, several years ago came from Illinois, to Carroll county, Iowa, and engaged in farming and raising, feeding, buying, and selling of live stock, doing a large business. He became possessed of about 2,500 acres of land near Glidden, in Carroll county, and later on of more than 600 acres of land in Monona county. He had several store buildings in Glidden, and about six years since acquired a residence worth several thousands of dollars, in the town, five or six miles from the farm. He was believed by all to be worth more than $200,000, and to be a man of high character, and his credit was measured by his requests. He was able to read in print, but in writing with difficulty, if at all. For several years he did part, at least, of his banking business at the German Bank in Carroll, Iowa, known in this case as the "Hess Bank" from the name of the cashier. As time passed, he left the Hess Bank and became a borrower from former friends in Illinois, and from live stock commission men in Omaha and Chicago, and from an Omaha bank, presently to be mentioned, and from a bank in Carroll, referred to as the "Arts Bank." In buying property, he at times would assume the payment of mortgages, but usually credit was extended him on the strength of his own signature. He had a son Henry, the owner of much property, for whom he indorsed large sums, who in 1904, became involved. But his suretyship debts he did not disclose until disaster overtook the son, subsequent to the mortgages in question. Alexander Armstrong, July 27, 1904, filed in this court his petition in voluntary bankruptcy, and August 26, 1904, he was adjudicated a bankrupt.

Wm. Arts, of Carroll, the county seat of Carroll county, is a banker and capitalist. His bank, the German American Bank, known as the "Arts Bank," is a private bank of $50,000 capital. Arts is a man of wealth, but in what sum is not disclosed. He is 64 years of age, and for the past two or three years, has been in bad health. He has three sons, W. A., Joseph, and Frank. W. A. Arts is his father's bank cashier. But Mr. Arts himself, when his health permitted, directed and controlled his affairs. Neither of the sons had any ownership in the bank, nor in the father's affairs. Joseph does not seem to have had much, if anything, to do with the matters in-

volved herein. The son Frank is a merchant in Nebraska. In 1904, he was called to Carroll on account of the father's illness, and while there, he and the cashier, W. A. Arts, thought it best to go over the affairs of the bank, and they concluded to and did take, May 2, 1904, from Armstrong and wife, a mortgage on his Carroll county farm of 2,280 acres to secure four notes then aggregating $98,-503.32. Mr. Arts was advised of this in the evening of that day by his son, and by a daughter who worked in the bank. He ratified the act, and in person took the mortgage the following day to the office of the county recorder and had it recorded; he then being convalescent. This mortgage being to secure an antecedent indebtedness, and given within four months of the proceedings in bankruptcy, is assailed by the trustee and other creditors, as being an unlawful preference.

The Union National Bank is of Omaha, with G. W. Wattles as its president, and Mr. Thomas as its cashier. Wattles had resided in Carroll county, Iowa, was acquainted with Mr. Armstrong, both before and since he (Wattles) removed to Omaha 12 years ago. June 13, 1904, Armstrong gave his note evidencing his indebtedness to the Wattles bank for $22,000, and a mortgage securing the same on the lands in both counties. He also gave for the same purpose a chattel mortgage on all his farm machinery and the crops for 1904, on the Carroll county farm. This note and these mortgages were taken in the name of G. W. Wattles, trustee, for convenience, the Union National Bank in fact being the owner. After taking the mortgage of $98,503.32, Arts continued business with Armstrong; the latter drawing checks on Arts' bank, thereby creating overdrafts aggregating near $3,000, which, with other indebtedness amounted June 17, 1904, to $5,512.40. On that day Armstrong gave Arts a mortgage to secure that sum, conveying 615 acres of Monona county land. Arts seeks to enforce that mortgage, and the trustee assails it as being an unlawful preference, as having been given within four months of the bankruptcy proceedings, and given to secure a prior indebtedness. These three claims have been submitted to the court. They were referred to the referee who took and has reported the evidence with his findings of fact, practically all of which are assailed by exceptions, some by one party, and some by others. While the court indorses some of the findings, but not all, the case is simplified for this court, and perhaps for the Appellate Court, if an appeal or proceedings for review be taken, by making independent findings of fact.

First, as to the McPherson claim:

The note for $22,000 is negotiable in form. McPherson bought it before due, knowing nothing of its consideration, nor that it was a renewal of prior notes, and knew nothing concerning any facts connected with the mortgage. In the usual course of business he paid Wattles in money, its full face value. A few days before buying the note, he knew of a proposed attachment suit against Armstrong, and was asked to become a surety on the bond. He declined to become such surety, and advised against bringing the ac-

tion. But he acquired no knowledge of Armstrong's insolvency, and all information that came to him with reference to the proposed action is of no importance in this case. During the pendency of this action, McPherson has sold the note and mortgages back to Wattles, or the bank. Whether selling the note back places the bank in a different position from what it once occupied I will not discuss. What I hold is that the note represents an actual and bona fide indebtedness for the full amount expressed. Armstrong has no defense to the note, nor any part thereof, in the hands of Wattles or his bank or in the hands of any holder. The mortgages securing the note would pass to McPherson both by assignment and as incidents to the note, and would pass back to Wattles, or the bank, when the note went back. But the question of these transfers, in my opinion, is immaterial, and it is not of the slightest concern whether Wattles or his bank, or McPherson, is pressing the claim. McPherson was an innocent holder of both the notes and mortgages for full value before due. Now Wattles' bank owns them. But the bankrupt statute controls the situation. I know of no authority that holds that an innocent purchaser before due of such paper, can escape from the bankrupt statute. And counsel for claimant cites no authority, and the contention is without force. If I am not correct in this, the dullest mind, with a stifling of the conscience, can easily circumvent the statute against unlawful preferences.

The McPherson claim was secured by mortgages. At the time they were given, Wattles and his bank had learned of the Arts mortgage. Mr. Thomas, the cashier, went to Armstrong to ascertain his financial standing which resulted in Armstrong giving him a signed written statement. That statement was to the effect that he owned Iowa real estate of the value of $223,400, after omitting his homestead. He placed the value of his homestead at $12,000. He placed his real estate mortgages, including the one to Arts, at $147,500, leaving the net value of his real estate, aside from his homestead, at $65,940. He represented his cattle, horses, hogs, and machinery to be worth $19,300, and his other debts, including that of Wattles, $17,900. Counting his homestead, his net worth, then according to his own schedule, was $54,340, and omitting his homestead his net worth, as per his statement, was $42,340. In my opinion the homestead should not be considered on the question of solvency or insolvency, although as eminent a judge as Judge Hammond held otherwise in Re Bauman (D. C.) 96 Fed. 946, and the letter of the statute sustains that holding.

In the year previous Armstrong made a written statement to Wattles' bank for the purpose of obtaining credit, now covered by the note and mortgages in question, in which his property, including his homestead, was listed at $246,750, and his liabilities at $36,000. Armstrong was believed by Wattles and his associates in the bank, as well as by the people generally, to be a man of integrity and high character, and in all respects worthy of belief. That Wattles and his cashier, in taking the security, believed Armstrong to be solvent, I have no doubt, and it is equally clear that Armstrong

himself then believed the same. There are but two facts tending to show that Armstrong then believed he was creating an unlawful preference. The one fact is that Armstrong so testifies. But as against his testimony is evidence from witnesses equally credible. And against his testimony are his two written statements; on one of which he obtained credit, and on the other was granted time. The fact that the bank asked for security, or even was insistent, is no proof of knowledge of insolvency. If such facts are to be deemed material as showing insolvency, or knowledge of insolvency, then any and every man asking for security is to be challenged in his effort to protect himself against future contingencies. Wattles knew that Arts had his claim covered by a mortgage, and it naturally and legitimately was a reason why he should have his claim secured. But wanting either a past or present indebtedness secured is not proof of knowledge of insolvency. Armstrong was a large dealer in cattle, and it is common knowledge of all informed people in the West, that such a business is of a fluctuating character. The solvent cattle dealer of this year may next year be in embarrassed circumstances.

The evidence fails to persuade me that Armstrong then knew that he was insolvent, and much less does it tend to persuade me that Wattles or his cashier knew of it. The fact that he was then insolvent is but one link in the chain of evidence. The facts are that Arts' mortgage started the talk. Then he gave the Wattles mortgage, insisting he would and could pay all claims in full. Then, after conferences, he concluded that bankruptcy proceedings would be profitable to him. He then recalled, and, for the first time in many years, if ever, he made known a very large claim of 20 years standing, due, as he says, to his wife. This claim was known by no one but himself and wife, and for years had been barred by the statute of limitations, but for the fact, that he only could plead the statute, and his own interest suggesting it, he waives the statute. And to make such waiver effective, he recalls, so he says, that he knew he was insolvent when he made the mortgages.

As to the Arts mortgage, the case is much stronger. Arts was not asking for a mortgage, and never had asked it. He was an old man, and had been stricken with disease. His cashier was content with the situation. His daughter working in the bank made no suggestion, nor did his other resident son. All of them, as a matter of filial duty, and probably by prospect of inheritance, were interested. Thereupon, his son from Nebraska comes to remain with the father during what was supposed to be his last illness. And this son, a business man, loitering about the bank, most sensibly said that Armstrong's indebtedness held by a feeble old man, was too large, and had run too long without security. The mortgage was requested for that reason, and it was given. And if this amounts to the dignity of proof of insolvency or knowledge thereof, then no man can safely close his affairs. The contention is that there was an oral agreement to keep it from record. This is not only denied by evidence of the most substantial and detailed character, but

the fact that it was at once recorded with no intervening circumstance, shows that the contention should not be believed. And the fact that Arts asked that a notation thereof be kept from a blotter on the counter is of slight importance. It was not a public record. The recorder kept it on his own volition, and the promiscuous crowd only examined it. Abstractors and searchers of titles and liens went to the official records, where the mortgage was of record and indexed. It was not unnatural that Arts preferred to not display his business to the gossips. It is a circumstance against Arts; but it is only a circumstance. But the substantial fact, in addition to all others, is that Armstrong with nothing to his credit, kept on drawing checks on the bank of Arts until he created an overdraft of several thousands of dollars. But for the belief of Arts, in the solvency of Armstrong, why were those checks honored? And but for the belief of Armstrong in his own solvency, why did he draw them? When he drew those checks, he expected them to be paid, thereby evidencing his belief that Arts believed him to be solvent. Any other answer makes him a confessed and common swindler of an old man, his long-time friend, and who had carried him for years. And this I do not believe. It is more charitable and reasonable to believe that he is now too anxious to participate in his wife's name of a larger share in the estate. Subsequent events show that he then was insolvent. But we are now looking backwards. Arts and Wattles were then looking forward. The result of it all is that both Arts and Wattles took their mortgages in good faith for actual indebtedness as stated in their mortgages. Neither of them knew of the insolvency of Armstrong, nor had either of them reasonable grounds for believing him to be insolvent. Nor did Armstrong then know it nor believe it, but he believed as he insisted over and over again that he was solvent, and would and could pay his debts in full with a few months' time.

A different state of facts exists as to the mortgage taken by Arts to secure the overdrafts referred to and some omitted indebtedness. That was the creation of an unlawful preference. Time had elapsed since taking his large mortgage, and a different situation existed, and the facts were becoming known. But as to the large mortgage of Arts, and the one to Wattles, on the foregoing facts, what is the law and how shall it be applied? Of course, all parts of the statute of 1898 and the amendments of 1903 must be construed together, and every provision must be given a meaning. And the apparent conflicting recitals can only be given a meaning as intended by Congress, by applying the provisions applicable to the facts. A statute arbitrary in its provisions can be interpreted in no other way.

The question is: What is the law of the case in hand? And in arriving at that the question is: What has been decided in cases similar to this? and not, what has been said by argument on other questions? That the scope of the statutes is that the bankrupt is to be protected and discharged, and his estate as owned by him four months prior to the adjudication, as said in one case by Judge Sanborn (Swarts v. Fourth Nat. Bank, 117 Fed. 1, 54 C. C. A. 387), is

true. And it is equally true as stated by Justice Miller (Wilson v. City Bank, 17 Wall. 480, 21 L. Ed. 723), reversing the order of statement, that the primary object is to secure a just distribution of the bankrupt's property, and the secondary purpose is to release the bankrupt from his debts. Undoubtedly correct as these statements are, there are exceptions thereto. It is only the honest debtor who is released, and from only part of his debts, and then only by surrendering part of his property, and such part as he has not lawfully disposed. So that the issues in the cases at bar must be kept in mind. And in ascertaining what is now before the court, material aid is given by stating what is not before the court.

By giving the mortgages, the question is not whether Armstrong committed acts of bankruptcy, and whether he could have been adjudicated a bankrupt in an involuntary proceeding, because this is a proceeding in voluntary bankruptcy. It was upon his own petition that he was adjudicated. Therefore the provisions of section 3, Act July 1, 1898, c. 541, 30 Stat. 546 [U. S. Comp. St. 1901, p. 3422], have no relevancy. But if mistaken as to this and if section 3 is relevant, then the language of the section shows that the preference condemned is the one made by the debtor with the intent by him to prefer such creditor over his other creditors. This is not a case where Arts or Wattles has received a preference, and is urging a claim with or without surrendering the preference, and, therefore, section 57g (30 Stat. 560 [U. S. Comp. St. 1901, p. 3444]) is not controlling. And if 57g has the slightest relevancy it will be seen that the amendment of 1903, Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 [U. S. Comp. St. Supp. 1905, p. 689], specifically refers to such preferences as can be avoided under 60b or 67e. Act July 1, 1898, c. 541, 30 Stat. 562, 564 [U. S. Comp. St. 1901, pp. 3445, 3449]. This is not a case wherein either Arts or Wattles is seeking to enforce a mortgage void under the Iowa laws, nor under the general unwritten law, as having been made or received with the intent to hinder, delay, or defraud creditors. The mortgages were authorized under the Iowa laws, and there is no fraud on the part of the mortgagor or the mortgagee, and no purpose to hinder, cheat, defraud, or delay any creditor. Therefore, neither the statute denouncing conveyances actually fraudulent, nor the state laws, control this case. And this is not a case wherein the trustee is seeking to recover property, including money turned over or paid, as an unlawful preference. Therefore section 70 (30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]), which provides that certain property shall vest in the trustee, and what property he can recover, is not decisive.

But this case, restated, is one where a debtor in fact insolvent, makes a mortgage to secure prior indebtedness within four months, free from fraud, believing he is solvent, and the mortgagee believing the same, and not having facts which would lead him to believe in insolvency. Section 60a, defines that to be a preference, but neither as an actual nor a constructive fraud. 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]. Section 60b provides that the trustee can avoid such preference by an action, or defensive proceedings

in court, in a case wherein the mortgagee shall have had reasonable grounds to believe that it was intended thereby to give a preference. And it follows that the two paragraphs of section 60a, and section 60b, pertaining to the one subject of preference, must be construed together. Otherwise, all preferences will be unlawful, and all preferences will be avoided. And then 60b becomes nothing but empty words. I shall briefly review the cases I believe to be in point, omitting the large number deciding questions arising under other sections of the statute.

In re Eggert, 102 Fed. 735, 43 C. C. A. 1, by the Circuit Court of Appeals, Seventh Circuit. The cases under the statute of 1867 are reviewed and elaborately discussed. The mortgage was within four months, was for a prior debt, and made when the debtor was insolvent. But the mortgagee did not know of the insolvency, and the trustee was ordered to pay the claim in full, and the order was affirmed. After reviewing the cases, Judge Jenkins says:

"The resultant of all these decisions we take to be this: That the creditor is not to be charged with the knowledge of his debtor's financial condition from mere nonpayment of his debt, or from circumstances which give rise to mere suspicion in his mind of possible insolvency; that it is not essential that the creditor should have actual knowledge of, or belief in, his debtor's solvency, but that he should have reasonable cause to believe his debtor to be solvent; that if facts and circumstances with respect to the debtor's financial condition are brought home to him, such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose."

Hackney v. Raymond Bros. Clarke Co., 94 N. W. 822, by the Supreme Court of Nebraska. The case was one brought by the trustee to recover property turned over within four months by an insolvent on a prior debt. The trustee was defeated and the case was affirmed largely on the strength of the Eggert Case.

In re Virginia Hardwood Company (D. C.) 139 Fed. 209, by Judge Rogers, of the Western Arkansas District. The mortgage was defeated, but only because of the facts, that an unlawful preference was intended, he having such knowledge of the insolvency and knowing that a preference was intended.

In re Graham (D. C.) 110 Fed. 133, decided by Judge Humphrey, of the District of Illinois. On the facts, the court held that the transfer within four months was made and received with the intent to create a preference, and therefore was set aside.

Egan Bank v. Rice, 119 Fed. 107, 56 C. C. A. 157, by the Circuit Court of Appeals, Eighth Circuit. The court held that the chattel mortgage in part to secure a prior debt, executed within four months, was fraudulent, because allowing the mortgagor to remain in possession and sell.

Pollock v. Jones, 124 Fed. 163, 61 C. C. A. 555, by the Circuit Court of Appeals, Fourth Circuit. The mortgage was for a prior debt executed within four months. The mortgage was avoided on two grounds: (1) Executed by one of the firm only; (2) because both mortgagor and mortgagee knew that a preference was created.

McNair v. McIntyre, 113 Fed. 113, 51 C. C. A. 89, by the Circuit

Court of Appeals, Fourth Circuit. The mortgage was for a prior debt, within four months, and was enforced against the trustee on findings that neither knew of the insolvency, and there was no intent to create a preference. Brandenburg on Bankruptcy (3d Ed.) § 962, presents the proposition in line with the foregoing cases. He analyzes the statutes by saying that not one section must be taken, but that force must be given to all the provisions, and reaches the conclusion that to avoid such a mortgage, five phases must concur, and if any one is lacking the transfer will be enforced, viz.: (1) The debtor must have been insolvent. (2) He must have made the mortgage. (3) The result must be to give the secured creditor a greater percentage than other creditors. (4) It must have been made within four months. (5) The mortgage creditor must have had reasonable cause to believe that a preference was intended. The law of Bankruptcy by Loveland (2d Ed.) §§ 159, 160, is stated the same as by Brandenburg. Cullinane v. Bank, 123 Iowa, 340, 343, 98 N. W. 887; Des Moines Bank v. Morgan Jewelry Co., 123 Iowa, 432, 437, 99 N. W. 121.

Counsel on both sides in the case at bar, most earnestly contended at the argument that the recent case by the Supreme Court of Keppel v. Tiffin Bank, 197 U. S. 356, 25 Sup. Ct. 443, 49 L. Ed. 790, is in point. But it is not. That was a case on the one question of the meaning of the word "surrender" under section 57g. And that court held, four judges dissenting, that when a mortgage was adjudged to be an unlawful preference, that the mortgagee could then participate as a general creditor, because he then had "surrendered." On that question the case is an authority, and on no other question. And Swartz v. Bank, 117 Fed. 1, 54 C. C. A. 387, was with reference to the surrender feature covered by 57g.

I conclude this opinion, by stating my general conclusions. Section 67e has reference to conveyances and transfers involving moral turpitude and which are fraudulent in fact. Section 60a defines the word "preference," while 60b provides what preferences can be avoided, and the two must be construed together and as a whole. If this be not so, then I am unable to see the purpose that 60b can serve. And the preference to be avoided must not only be a mortgage or transfer executed by an insolvent within four months, and to secure a prior debt, but the mortgagee when taking it must have had reasonable cause to believe it was intended to give him a greater per cent. than the other creditors would receive. I appreciate the importance of the argument that the property of the bankrupt is to be equitably and ratably apportioned among the creditors. Much can be said as to that, and in many cases such is the law. But the term "creditors" does not mean all creditors, and when the law is so made to mean, then credit, as well as business generally is at an end. General principles of jurisprudence must govern in business circles, except as changed by statute. And when Congress enacted section 3 against preferences it was provided to be unlawful only when the debtor intended the preference, and by section 60b.

when the mortgagee had the intent. And a mortgage of itself is not a preference.

The holding is that Arts, as to his large claim, and Wattles, as to his claim, had no such intent. Those two claims will be paid by the trustee. The other claim of Arts will stand as an unsecured claim.