### In re STAR SPRING BED CO.

(District Court, D. New Jersey. April 18, 1919.)

**1. BANKRUPTCY** ⬤⟿303(3)—PREFERENCE—INSOLVENCY—EVIDENCE.

The amount realized from sale of assets by the receiver or trustee in bankruptcy, while not conclusive as to the value of the assets, is evidence thereof, and where the liabilities greatly exceeded such amount and there was no evidence of change in the bankrupt's condition, it justifies a finding of insolvency, when a transfer was made the day before petition was filed.

**2. BANKRUPTCY** ⬤⟿165(4)—PREFERENCE—TAKING NEW SECURITIES.

Where a bank, the day before an involuntary petition in bankruptcy was filed, surrendered notes held by it indorsed by the bankrupt in exchange for a note of the bankrupt for the same amount secured by assignment of accounts exceeding the amount of the note by $8,000, the transaction was not a mere exchange of securities, but was a transfer amounting to preference, if made with knowledge of insolvency.

**3. BANKRUPTCY** ⬤⟿165(1)—"PREFERENCE"—EFFECT OF TRANSFER—"CLASS."

In the provision of the Bankruptcy Act, defining preference as a transfer which enables the creditor to obtain a greater percentage than other creditors of the same class, "class" refers to the four classes of creditors specified in section 64 (Comp. St. § 9648), tax creditors, creditors for wages, creditors entitled by law to priority, and general creditors, and secured general creditors are in the same class as unsecured creditors.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Class; Preference.]

**4. BANKRUPTCY** ⬤⟿166(3)—PREFERENCE—KNOWLEDGE OF CREDITOR—INSOLVENCY OF DEBTOR.

That a bank, to whom a bankrupt transferred accounts the day before the petition was filed, knew that the bankrupt had overdrawn his account, that he had deceived the bank as to securities held by it, and that the transaction was handled for the bankrupt by an attorney, and there-

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

after the bank's officers reopened its books and kept its clerks during the evening to enter the transaction and send notice to the debtors of the assignment on that date, justifies the conclusion that the bank's officers believed the transferror to be insolvent.

**5. BANKRUPTCY ☞298—PREFERENCE—RIGHTS OF TRUSTEE—LACHES.**

A delay by the trustee in bankruptcy of several months after a claim is filed, in objecting to a claim as a preference, is not such laches as bars his right to relief, where he objected to the claim as soon as he knew it was filed, though in the meantime the statute of limitations may have run against securities surrendered by the creditor.

In Bankruptcy. Involuntary proceedings against the Star Spring Bed Company. On petition to review an order of the referee holding that a transaction with the Union National Bank did not constitute a preference. Exceptions to the order sustained, and claim expunged, unless the bank surrendered the preference.

See, also, 243 Fed. 957.

Nathan Bilder, of Newark, N. J., and Robert P. Levis, of New York City, for trustee.

McCarter & English, of Newark, N. J., for Union National Bank.

DAVIS, District Judge. On April 18, 1911, the Star Spring Bed Company, the bankrupt, was indebted to the Union National Bank, hereinafter called the bank, on account of discounts made by the said bank for the benefit of the bankrupt in the sum of $58,200. About $20,000 of this amount was represented by notes made by various persons in favor of the bankrupt and indorsed by it. The bank supposed that the said notes were business paper and represented business transactions between the bankrupt and its customers. On the said 18th day of April, after banking hours, at about 4 o'clock in the afternoon, Abraham Silberberg, an attorney representing the bankrupt, went to the bank and advised the president and cashier that the said notes were not business paper received by the company in the pursuance of its business, but were accommodation paper, and that the company desired to withdraw them (although they were not due, and would not be due in some instances for months), and to pay off the said notes with, or put in their place, a note payable on demand for $20,000, secured by certain accounts aggregating $28,000, due the company on its business transactions. The proposition was agreed to by the president and cashier, who delivered to Mr. Silberberg the said accommodation paper, and received from him the demand note for $20,000, and the said accounts which were assigned to the bank. On the following day, an involuntary petition in bankruptcy was filed against the company, and it was shortly thereafter adjudicated a bankrupt, and the assets thereof proved to be sufficient to pay only about 50 per cent. of the indebtedness of the said company.

On the last day that it could do so, the bank filed a claim for the unpaid balance against the estate in bankruptcy. The trustee objected to this claim on the ground that the bank had secured a preference in the before-mentioned transaction on the 18th day of April, and urged that the said claim should not be allowed by the

referee, unless the bank surrendered this alleged preference. The referee held that the transfer did not constitute a preference, that the transaction was a mere substitution or exchange of security, and that the bank, being a secured creditor, did not receive a greater percentage of its debt than other creditors of the same class, for there was no other secured creditor than the bank, and it was therefore in a class by itself. The order of the referee is before this court for review.

[1] In order to prevail, the trustee must establish the following four propositions: (1) That the transaction complained of was made within four months before the filing of the petition; (2) that at the time of the transfer the bankrupt was insolvent within the meaning of section 1 (15) of the Bankruptcy Act of July 1, 1898 (30 Stat. 544, c. 541 [Comp. St. § 9585]); (3) that the effect of the transaction operated as a preference to the bank, enabling it to receive a larger percentage of its debt than other creditors of the same class; (4) that the bank had reasonable cause to believe that the enforcement of the said transfer would effect a preference.

1. It is admitted that the transaction took place within four months of the filing of the petition. In fact, it occurred within 24 hours thereof.

2. The company was adjudicated a bankrupt on petition filed the day following the transaction complained of. The indebtedness of the bankrupt on that day was $126,616.61. The trustee has realized from all the assets of the bankrupt $69,000. The evidence does not show any change in the amount of the assets of the bankrupt between 4 o'clock on the 18th and the time of the filing of the petition on the 19th of April, 1911. The adjudication settles the question of insolvency on the 19th, at the time the petition was filed. That question is res judicata. The amount realized from the sale of assets by the receiver or trustee in bankruptcy may not be of the highest probative character as to the actual value of the assets; but it is of some value, and when no change is shown in the assets between 4 o'clock in the afternoon of one day and the following day, on which a concern is adjudicated a bankrupt, it is evidence that should be considered and which may justify the conclusion, in the absence of proof to the contrary, that the concern was insolvent at 4 o'clock on the previous day. Ridge Avenue Bank v. Studheim, 145 Fed. 798, 76 C. C. A. 362; s. c., 15 Am. Bankr. Rep. 132, 132 Fed. 951; Morris v. Tannenbaum, 26 Am. Bankr. Rep. 368; Grandison v. National Bank of Commerce, 231 Fed. 800, 145 C. C. A. 620, 36 Am. Bankr. Rep. 438; Clarion Bank v. Jones, 88 U. S. (21 Wall.) 325, 338, 22 L. Ed. 542.

The conclusion reached by the referee made it unnecessary that he find, as a fact, that the bankrupt was insolvent at the time of the transfer; but as I understand his language he did find that the company was insolvent at the time of the "transfer." He said:

"Although it has been held that a finding of insolvency on November 1st does not show insolvency on October 17th (Re Rome Planing Mill [D. C.] 96 Fed. 812), and that no legal presumption of insolvency on April 29th can be predicated upon an adjudication of insolvency on May 16th (Kimball v. Dress-

er [98 Me. 519] 57 Atl. 787), yet it seems to me that in this case, where the insolvency is established as of April 19th, and the transfer was made late in the day on April 18th, it is a fair presumption that the financial condition thus determined existed at the time of the transfer."

In my opinion, the conclusion of the referee is correct, and the bankrupt was insolvent at 4 o'clock on April 18, 1911, when the "transfer" was made.

[2] 3. Did the transfer constitute a preference? The test of a preference, under the act, is the payment, out of the bankrupt's property, of a larger percentage of the creditors' claim than other creditors of the same class receive. Swarts v. National Bank, 8 Am. Bankr. Rep. 677, 117 Fed. 1, 54 C. C. A. 387. The referee held that the bank did not receive a preference. "The transaction," said he, "was substantially that of an exchange of securities. The bank surrendered the obligations of third parties, upon which the bankrupt corporation was indorser, and received in lieu thereof the assignment of the accounts to secure a new note practically equal in amount to the notes surrendered. * * * A mere exchange of securities by which the position of the creditor is not proved to be bettered, cannot be considered a preference. Sawyer v. Turpin, 91 U. S. 114 [23 L. Ed. 235]; In re Noel [D. C.] 14 Am. Bankr. Rep. 715, 137 Fed. 694."

The facts of the two cases cited by the referee are quite different from those in the case at bar. In the first case cited, the debtor gave to his creditor a bill of sale of a frame building erected on leased ground, more than four months before the filing of the petition in bankruptcy, to secure the sum of $27,839. The debtor, therefore, had only a chattel interest in the property. The bill of sale "was understood by the parties to be a security for the debt due. It was in substantial legal effect, though not in form, a mortgage." Within four months of the bankruptcy, the creditor surrendered the bill of sale and received a mortgage on the same identical property. The court said:

"The mortgage covered the same property. It embraced nothing more. It withdrew nothing from the control of the bankrupt, or from the reach of the bankrupt's creditors, that had not been withdrawn by the bill of sale. Giving the mortgage in lieu of the bill of sale, as was done, was therefore a mere exchange in the form of the security. In no sense can it be regarded as a new preference. * * * It is too well settled to require discussion that an exchange of securities within the four months is not a fraudulent preference within the meaning of the Bankrupt Law, even when the creditor and the debtor know that the latter is insolvent, if the security given up is a valid one when the exchange is made, and if it be undoubtedly of equal value with the security substituted for it. * * * The reason is that the exchange takes nothing away from the other creditors. It is therefore not in conflict with the thirty-fifth section of the act, the purpose of which is to secure a ratable distribution of the property of a bankrupt owned by him at the time of his becoming bankrupt, and undiminished by any fraudulent preferences given within four months prior thereto."

The reasons why the court held in that case that the exchange of securities did not constitute a preference are the very reasons which indicate a preference in the present case. In that case the exchange

"withdrew nothing from the control of the bankrupt, or from the reach of the bankrupt's creditors"; but in this case the so-called exchange withdrew accounts aggregating $28,000 from the bankrupt and from·the reach of the bankrupt's creditors. The reason why a mere exchange of securities does not constitute a preference is that it "takes nothing away from the other creditors," and leaves the bankrupt's assets "undiminished" by the transaction. Further:

"The security given must be a valid one when the exchange is made and must be of undoubted equal value with the security substituted for it."

The validity of the security withdrawn in the present case is unknown and its actual value is a question of speculation. That security was destroyed within a few days after the transfer and entirely lost to the estate in bankruptcy, whatever its value might have been. The fact is that for some reason, unsatisfactorily explained, the bankrupt seemed to think it necessary, or at least advisable, to withdraw the security from the possession of the bank, and did so the day before the petition was filed, and either permitted or caused it to be destroyed. In the second case (In re Noel) cited by the referee there was simply the exchange of the form of security, the security in each case being identically the same. The transaction in question was not "a mere exchange of securities by which the position of the creditors is not proved to be bettered." The cases cited by the referee do not support his conclusion.

[3] The referee further states that—

"A point not argued, but appearing to me to be decisive of this case, is that one essential element of a voidable preferential transfer is entirely lacking, that is the effect of the transfer must be to enable the creditor to obtain a greater percentage of his debt than other creditors of the same class. * * * Here, however, is a creditor holding security who surrenders it and receives other security. What creditors 'of the same class' are there over whom he has acquired a preference? There is ʼno proof that there were any."

In other words, the referee held that inasmuch as the evidence showed that the bank was a secured creditor, to the extent of the notes indorsed by the bankrupt, and that the claims of all other creditors were unsecured, the bank was in a class by itself, a secured creditor, and did not and could not receive a larger percentage of its debt than any other creditor of the same class, because there was no other such creditor. Consequently the transfer did not and could not constitute a preference. The test of classification, on his theory, is the security or nonsecurity that a creditor has for ,his debt, and this finds support in an opinion rendered by Judge Grosscup, of the Seventh circuit, in the case of Doyle v. Bank, 8 Am. Bankr. Rep. 535, 116 Fed. 295, 54 C. C. A. 97. Judge Sanborn, of the ·Circuit Court of Appeals of the Eighth Circuit, in a very clear and well-reasoned opinion, reached a different conclusion in the case of Swarts v. Fourth National Bank, 8 Am. Bankr. Rep. 673, 117 Fed. 1, 54 C. C. A. 387. He holds that secured and unsecured creditors are in the same class within the meaning of the act, and in this he is followed by the Circuit Court of Appeals of the Sixth Circuit

in the case of Livingston v. Heineman, 10 Am. Bankr. Rep. 39, 120 Fed. 786, 57 C. C. A. 154.

The act itself does not define the word "class," nor state in terms what creditors are in the same class, or different classes. It creates and specifies classes, and from a study of these it may be possible to arrive at a definition of the word "class" within the meaning of the act. Section 64 (Comp. St. § 9648) specifies three classes—parties to whom taxes are owing, employés holding claims for certain wages, and those who, by the laws of the states or of the United States, are entitled to priority. There are also general creditors. The three classes above mentioned have priority over general creditors. There are, broadly speaking, two classes of creditors—those who have priority and are paid in full, and general creditors, including secured and unsecured. These are the classes of creditors of which the Bankruptcy Act treats. Every creditor in the same class always receives the same percentage on his claim that every other creditor in that class receives. Different classes of creditors are paid different percentages in accordance with the provisions of the act, but creditors of the same class always receive the same percentage. Creditors entitled to receive out of the bankrupt estate the same percentage of their claims are therefore in the same class, regardless of whether they may collect any deficiency from others. A creditor may have two notes made by the bankrupt—one secured by the indorsement of a third party, the other unsecured. He is entitled to receive the same percentage out of the bankrupt estate on both notes. He may, however, collect the deficiency on the secured note from the indorser, or he may collect the entire note in the first place from the indorser, who in turn may prove the note against the bankrupt estate and receive the same percentage upon the claim which the original creditor would have received, or which was received on the unsecured note. I agree with the conclusion of Judge Sanborn that, within the meaning of the Bankruptcy Act, the test of classification is the percentage paid upon the claim out of the estate of the bankrupt, and that secured and unsecured creditors are in the same class.

The bankrupt owed the bank on April 18, 1911, in addition to the amount evidenced by the notes surrendered by the bank on that day, about $37,000. In addition to the delivery of the said note, payable on demand for $20,000, the bankrupt, as above stated, assigned and also delivered to the bank accounts payable to it, from customers, aggregating $28,000. The said $20,000 note provided, inter alia:

"And it is hereby agreed and understood that if recourse is had to the collaterals, any excess of collaterals upon this note shall be applicable to any other note or claim held by said bank against the undersigned."

Recourse was had to the collaterals, the accounts, and it was understood by both parties that recourse was to be had to the collaterals. The president of the bank testified that—

"The note was to run with the collateral and as the money was paid in it was to liquidate the note." Testimony of September 17, 1911, p. 19.

And in pursuance of this understanding the clerks of the bank worked overtime on the day of the transaction, until 8 o'clock in

the evening, in order to send out notices to the debtors, on those accounts, of the assignment, to prevent the payment of them to the bankrupt or to others than the bank. Testimony of September 17, 1911, p. 29. The bank, therefore, had the right, under the terms of the note, to apply the $8,000, collateral in excess of the note, to its claim against the bankrupt of about $37,000. Assuming that the notes returned to the bankrupt by the bank on that day were collectible and legitimate, the bank received an excess security of $8,000, to be applied to its claim over and above the security which it surrendered. The bank says in reply that, at the time of the objection made to its claim, it had collected only $15,000 of the accounts; but the trustee rejoins by saying:

"That the point which the referee has decided as exchange of security was not urged by any of the counsel, and was not urged anywhere in the case, and if it had been, it could readily have been established that a large amount of the assigned accounts were collected by the trustee and are being held by him pending the outcome of this proceeding. No such proof was offered, because no such point was taken or urged by either side."

This, however, is not in the testimony and may not be considered. The decision, however, does not depend upon it. If it did, I would refer the case, so that further testimony might be taken on the point. Whatever the possible value of the said security surrendered by the bank might have been, the fact remains that by the transaction the bank received $8,000 more security than it had for the indebtedness due from the bankrupt, and if the referee's order is sustained it will receive a larger percentage on its debt than any other creditor of the same class. I am therefore constrained to hold that the transfer constituted a preference.

[4] 4. The only remaining question is whether or not the bank had reasonable cause to believe that the enforcement of the transfer would effect a preference. If it did, such conclusion must be gathered from the circumstances surrounding the transaction, which was negotiated on the one side by the attorney of the bankrupt, who in this case was its agent, and on the other side by the president and cashier of the bank, each of whom alleges that he did not negotiate the transaction with said attorney, but that it was done mainly by the other.

There was an overdraft in the account of the bankrupt at the bank on that very day of $168.56, and the officers of the bank had knowledge of it. The bank, before the visit of the attorney, had been told, or at least always believed, that the notes surrendered were business paper, and had been received by the bankrupt as the result of business transactions. When the bank was informed by the attorney that they were accommodation paper, it was surprised. The officers themselves, of the bankrupt, for over five years, had transacted its business with the bank. Abraham Silberberg, Esq., had never before transacted any business with the bank in behalf of the bankrupt or otherwise. The attorney was at the bank for some considerable time, and the court is told but very little of what he said during that time.

The officers of the bank, however, did know at least these three facts: There was an overdraft of the bankrupt at the bank that day. The bank had been deceived by the bankrupt in being led to believe that the paper which it surrendered was business paper, for if it had already been known to the bank, the attorney's action in seeing to it that the bank was enlightened is inexplicable. The officers of the bankrupt company, who had transacted its business for over five years, for some reason, did not appear at the bank on the day of the overdraft, to inform it of the character of the securities which it held, and to negotiate this transaction, but instead an attorney, unknown to it, came proposing to give a note, payable on demand, which had been prepared before he came, for notes some of which were not due for several months.

Something must have made a profound impression upon the president and cashier of the bank, whose books had been closed and balanced for that day. Yet the president and cashier regarded the information received from the attorney of sufficient importance to justify the reopening of the bank books, even though erasures had to be made therefor, and to make the entries of the transaction as of that day. The clerks of the bank were detained until 8 o'clock in the evening, in order to send out notices to all the persons whose accounts had been assigned to the bank. All of this was unusual, unreasonable, and is unaccounted for upon any rational theory, except that the bank had some information that something was going to happen the following day, or in the near future; and something did happen. I am forced to the conclusion, as the only reasonable explanation of its action on that day, that the bank had reasonable cause to believe that the bankrupt was insolvent, and that the enforcement of the transfer of the accounts to it would effect a preference, and enable it to receive a larger percentage of its debt than any other creditor of the same class.

[5] I have fully considered the questions of laches urged against the trustee, who waited several months after the claim of the bank was filed before he objected thereto or moved to expunge the same. It is alleged that the notes surrendered by the bank were destroyed by the officers of the bankrupt within two or three days thereafter. The trustee says that as soon as he "found that the claim was filed he presented objections, charging the preference." The trustee, in my opinion, is not guilty of such laches as would justify me in overruling, on that ground, his exceptions. If during the consideration of this case the statute has run against any of the notes surrendered by the bank, and the bank is not now in position to pursue its remedy against the makers thereof, as urged at the argument, that fact is not chargeable to the trustee.

The exceptions to the order of the referee are sustained, and the order allowing the claim will be set aside, and the claim expunged, unless the bank surrenders the preference it received.