## HOUGH v. ATCHISON, T. & S. F. RY. CO.
### In re Z. J. FORT-TIDWELL CO.
Circuit Court of Appeals, Tenth Circuit.
July 26, 1929.

No. 25.

Frederick P. Cranston, of Denver, Colo., for appellant.

Erl H. Ellis, of Denver, Colo. (Grant, Ellis, Shafroth & Toll, of Denver, Colo., on the brief), for appellee.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge. This is an action by a trustee in bankruptcy to recover a preference which he alleges to be voidable. The lower court found against him, and he appeals.

The facts are not in substantial dispute. The Z. J. Fort-Tidwell Company was adjudged a bankrupt on December 10, 1926. It had been engaged in the business of producing, packing, and marketing vegetables, fruit, and produce, in Colorado and Arizona, with its headquarters at Denver. In the fall of 1926 the bankrupt was in need of certain crate material for use in packing its lettuce in Arizona. Four cars were shipped from Denver to a siding at Alhambra, Ariz., at which point no railway agent was maintained. The freight was not prepaid; the bankrupt not being upon the credit list of the railway company, it was necessary for the freight bill to be paid before the freight was delivered. It had been customary for the bankrupt to pay these freights bills at the office of the railway company in Phœnix, by a sight draft drawn by the Phœnix manager of the bankrupt upon a Denver bank. It is stipulated "that such drafts were regarded the same as checks and accepted as cash and previously had always been paid."

On the 27th and 28th of October, two of the cars reached the siding at Alhambra, and the next day the manager of the bankrupt at Phœnix drew drafts in payment of the freight in the customary way. These drafts were not paid, and the agent of the railway company at Phœnix on November 13th advised the railway company's Denver agent of their dishonor. The Denver agent of the railway company undertook to collect the drafts, and was put off by the bankrupt with the statement that there was an error in one draft, and he would pay the other as soon as he could. The Denver agent of the railway company wired its Phœnix agent on November 18th of the facts, and advised, "Protect yourself on future deliveries cash." Two days later two other cars arrived at Alhambra. Another draft was accepted for payment of the freight charges, which was later dishonored. The Phœnix agent of the railway company advised his Denver office that Alhambra was a prepay station, and that there was no way they could protect the cars in Phœnix; that the cars should not be ac-

cepted for shipment unless the freight was prepaid.

About December 3d, the bankrupt opened negotiations with one Hartner for the sale of the Arizona assets of the bankrupt corporation. A written contract was entered into on December 6th. Hartner, who was financially responsible, was unwilling to purchase these assets unless he could procure from the railway company the right to continue to use a loading station on the right of way of the railway company at Alhambra. The bankrupt had been maintaining such loading station at the sufferance of the railway company, and this right, indispensable to the conduct of the bankrupt's business, was jeopardized by the dishonor of the drafts. Hartner was advised of the fact of the drafts given for the freight bills being dishonored. Prior to entering into the contract, then, Hartner inquired of the railway company if they would give him the right to maintain this loading station and a "clear title * * * for the use of the ground" if he would pay the dishonored drafts. To this the railway company agreed. Hartner's purchase contract was submitted to creditors of the bankrupt representing about 75 per cent. of its total indebtedness and approved. Thereupon Hartner entered into the contract to purchase the Arizona assets, and out of his own funds paid the dishonored drafts; such payment being only a part of the purchase price. The suit is to recover the payments so made to the railway company. The trial court found that the payments made were not preferential under the law and denied recovery.

Section 60b of the National Bankruptcy Law (11 USCA § 96(b) provides:

"If a bankrupt shall * * * have made a transfer of any of his property, and if, at the time of the transfer, * * * and being within four months before the filing of the petition in bankruptcy or after the filing thereof and before the adjudication, the bankrupt be insolvent and the judgment or transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person."

It satisfactorily appears that the bankrupt was insolvent at all of the times covered by the transactions in question. The trial court did not make any finding as to the knowledge of the railway company as to the insolvency, and it is not essential for a disposition of the case that the conflicting evidence be reviewed in that respect.

■ The conclusion of the trial court was correct. In the first place, while there was a transfer of a part of the property of the bankrupt, the transfer was not to the railway company, but to Hartner. It is true that an unlawful preference may be recovered, notwithstanding the fact that the transfer is not made directly to the creditor but is made to a third person for him. In National Bank of Newport v. National Herkimer County Bank, 225 U. S. 178, 184, 32 S. Ct. 633, 635 (56 L. Ed. 1042), it was held:

"If the bankrupt has made a transfer of his property, the effect of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save him."

From this established rule of law, the appellant argues that if Mr. Hartner had not paid the sum in question to the railway company, he would have paid such sum to the bankrupt. Appellant's entire argument is bottomed on this statement in his brief: "If he [Hartner] had not paid this to appellee, it would have been paid to bankrupt. The bankrupt's estate was thus diminished." This conclusion is contrary to the admitted facts. The admitted facts are that the sale to Hartner, which the bankrupt and the creditors were desirous of making, could not have been made at all, unless the railway company had made a new lease for the use of a part of the right of way to Hartner. The contract between Hartner and the bankrupt recites:

"Bankrupt may be deprived of its right to maintain its loading station now held as a personal privilege by bankrupt, located on right of way of defendant at Alhambra and thereby become unable to make further shipments. Shipping season of vegetables just commenced and unless Fannin Ranch crops are shipped and contracts with growers carried out, bankrupt will lose ranch, crops and moneys due under contracts. Bankrupt desires to sell to Hartner to prevent total loss, to insure fulfillment of contract and avoid liability thereon, and to realize as much as possible."

The railway company would not lease to Hartner unless the drafts were paid. He took the lease, paid the drafts, and bought the Arizona assets. By this deal, the bankrupt saved its loading rights and its contracts. The payment received by the railway company did not come from the bankrupt, or from any of the bankrupt's assets, but from Hartner. If the railway company had not

made the lease, and had not received its money, the bankrupt's estate would not have received the consideration of the sale from Hartner, for Hartner would not have made the deal. Whether the creditors would have been better off not to have made the sale to Hartner, which could only be made in consideration of Hartner's paying these drafts, is not open to review here. At the time the transaction was made, creditors representing about 75 per cent. of the bankrupt's debts believed that the whole transaction was for the benefit of the bankrupt's estate. But courts do not make contracts. A consideration passed to the bankrupt's estate by virtue of the sale to Hartner; the act of the railway company made that consideration possible. That transaction cannot now be undone, for the railway company is bound by its lease to Hartner.

▮▮ Again, the Bankrupt Law undertakes to prevent one creditor from obtaining a preference at the expense of other creditors in like situation. "Cash transactions are not within the prohibition." Remington on Bankruptcy (3d Ed.) § 1695. The use of checks or their equivalent is the accepted method of consummating cash transactions of this size. It will be remembered that it is agreed that the bankrupt was not on the credit list of the railway company. The bankrupt procured the possession of the crate material by giving these sight drafts. The Circuit Court of Appeals of the Second Circuit has held that, where a seller delivers a bond to a bankrupt, and later in the day, in accordance with custom, receives a check for the bond, which check was protested, the transaction was a cash sale, and the bond could be recovered from the trustee in bankruptcy. In re Perpall, 256 F. 758. And in another case of the same title (271 F. 466) the same court declined to require a creditor to pay back to the trustee the proceeds of a check which he had received for the purchase price of bonds, notwithstanding the fact that the check was received and paid after the filing of the petition in bankruptcy, and notwithstanding the fact that some hours elapsed between the delivery of the bonds and the receipt of the check. It was held that the entire matter was a cash transaction, notwithstanding the use of checks instead of currency, and notwithstanding the lapse of a short period of time between the delivery of the bonds and the receipt of the check. A cash transaction may later involve the extension of credit within the meaning of the quoted statute, as where one holding a protested check agrees to hold it for a definite period, or takes security for its pay-

ment. Security Trust & Savings Bank v. Wm. R. Staats Co., 233 F. 514 (9 C. C. A.). No such facts are here present.

In Remington on Bankruptcy (3d Ed.) § 1674, the author states:

"Where a seller has the right to rescind a sale and recover the goods, such right being predicated upon the failure of the title to pass for lack of meeting of minds, a return of such goods will not constitute a preference; for the seller thereby is declared never to have parted with his ownership, nor have become a creditor for the goods, and title to them is not in the bankrupt."

In Illinois Parlor Frame Co. v. Goldman, 257 F. 300 (7 C. C. A.), the bankrupt on April 1, 1916, obtained a line of credit by certain false and fraudulent representations. Thereafter goods were sold to the bankrupt by the defendant. On June 9, the fraud was discovered, and the bankrupt transferred to the defendant certain accounts in payment of its indebtedness. A suit was brought to recover this payment as a preference. In denying a recovery the court said:

"But on June 9th appellant concededly had a right to rescind the fraudulent sales and to recover back such of the goods as were then in the bankrupt's possession. Clearly a return of these goods would not be a preference; to the extent of their value, payment could no more effectuate a preference; neither transaction would diminish the estate to which bankrupt was then entitled. That appellant did not expressly assert a right of rescission is immaterial; it relinquished that right in confirming the sale; it then gave up a property interest equal to the value of the goods then on hand. To that extent the transfer was for a present consideration, and not preferential."

In Mulroney Mfg. Co. v. Weeks, 185 Iowa, 714, 171 N. W. 36, it was held that where a bankrupt secured possession of goods by giving a worthless check, the recovery of the goods does not constitute a preference. To the same general effect, see Manly v. Ohio Shoe Co. (4 C. C. A.) 25 F.(2d) 384, 59 A. L. R. 413; In re Weissman (2 C. C. A.) 19 F.(2d) 769, 53 A. L. R. 644. Nor does the payment of a valid lien which is not greater than the value of the security constitute a preference, and for the same reason, that it does not diminish the estate to which the creditors are rightfully entitled to look. Root Mfg. Co. v. Johnson (7 C. C. A.) 219 F. 397; 7 C. J. 164.

In the case at bar, the possession of the freight was procured by the giving of sight drafts which were dishonored on presenta-

tion. The railway company had a right to recover the possession so wrongfully obtained. Such recovery would not have diminished the estate to which the creditors are rightfully entitled, nor constitute a preference. Accepting payment of the draft, in lieu of recovery of the goods, is not a recoverable preference. From whatever angle you may look at it, one fact stands out: The bankrupt procured possession of this crate material by giving the equivalent of a worthless check. The creditors have no legal or moral right to the crate material, or its sale price, without paying the freight.

The trial court decided the case correctly and its judgment is affirmed.