**In re WINDOR INDUSTRIES INC.**

**Civ. A. No. CA3–77–271–F.**

United States District Court,
N. D. Texas,
Dallas Division.

Oct. 20, 1978.

Molly W. Bartholow, Dallas, Tex., Kent D. Kibbie, Law, Snakard, Brown & Gambill, Fort Worth, Tex., for plaintiff.

Carl S. Fitzgerald, Lawrence L. Beason, Coke & Coke, A. L. Vickers, Dallas, Tex., Trustee for Bankrupt.

## OPINION ON APPEAL

ROBERT W. PORTER, District Judge.

This action originated when the Plaintiffs, Virginia Capital Corporation, Sackman-Gilliland Corporation, Jack Levine, Benjamin Malman, and Arthur Malman (hereinafter called the "Malman Group") filed a motion requesting that the automatic stay be lifted to permit the Malman Group to foreclose certain claimed lien rights upon a 10.47 acre tract of land (hereinafter called the Pinnell Tract). The trustee, Carl S. Fitzgerald, objected to the lifting of the stay and counterclaimed to recover a second lien deed of trust interest on a ⅓ interest in the Pinnell Tract, and the sum of $25,000 cash which had been transferred to the Plaintiffs.

In 1972, the Malman Group acquired certain notes and debentures of Windor Industries, Inc. totalling $300,000 and obtained as security a deed of trust lien on certain property of Windor and others located in Dallas County, Texas. The Bankruptcy Court found that the relationship between Windor and the Malman Group was very close, and that in mid-1973 Windor sought an additional loan of $1,000,000 through the Malman Group. At that time information came to light which indicated that Windor was in a precarious financial situation and the Malman Group, instead of advancing additional capital to Windor, moved to acquire added security on February 6, 1974.

The Bankruptcy Court held that the transfer of February 6, 1974 of a second lien deed of trust interest on a ⅓ interest in the Pinnell Tract and $25,000 cash to the Malman Group was within four months of the filing of an involuntary petition in bankruptcy against Windor on June 3, 1974, and that the Malman Group by virtue of the November 22, 1972 loan to Windor in the amount of $300,000.00, was a creditor with an antecedent debt. The Court also found that there were 155 creditors of the bankrupt's estate who had filed claims totalling $3,922,975.58 and that they could share in an estate which consisted of $174,292.81. The Court found that the Malman Group had obtained $25,000.00 cash plus various lien rights to property of Windor and others. The market value of the Pinnell property at the time of the transaction on the date of trial was $501,680.30, and the Court determined that if the Malman Group were permitted to foreclose their lien rights on the Pinnell tract, they would secure 100% of their debt, even taking into consideration that there was a $50,000.00 first lien on the Pinnell tract.

The Bankruptcy Court also found that the Plaintiffs had reasonable cause to believe Windor was insolvent on February 6, 1974 and that on February 6, 1974 the aggregate of the property of Windor was not at a fair valuation sufficient to pay its debts within the meaning of § 1(19) of the Bankruptcy Act, 11 U.S.C. § 1.

Based upon these findings, the Bankruptcy Court held that the lien priority on the Pinnell tract and the $25,000.00 was a voidable preference. The Bankruptcy Court also found that the security transferred was disproportionately large as compared with the amount of secured debt, and not fair consideration within the terms of the Bankruptcy Act. The Court found that there was no element of good faith in the exchange and that it was fraudulent within the meaning of § 67 of the Bankruptcy Act.

### Preference Under § 60a

Section 60a defines what constitutes a preference for purposes of the Bankruptcy Act. There are eight elements of a preference:

(a) A transfer;

(b) of the bankrupt's non-exempt property;

(c) made or suffered by the bankrupt;

(d) within four months of the filing of the bankruptcy petition;

(e) to or for the benefit of the creditor;

(f) for or on account of an antecedent debt;

(g) while the debtor was insolvent;

(h) the effect of which must be to enable the transferee to obtain a greater percent-

age of his debt than some other creditors of the same class.

The Malman Group challenges the finding of a preference by the Bankruptcy Court on three grounds:

(1) The Bankruptcy Court was required to find a diminution in the bankrupt's estate and there was no diminution of the bankrupt's estate as a result of the February 6, 1974 transaction;

(2) The trustee failed to prove that the bankrupt was insolvent at the time of the transfer; and

(3) The Bankruptcy Court erred in determining that a creditor, in this case the Malman Group, secured by real property in the estate of the bankrupt is, for the purpose of determining whether such creditor received a greater percentage of its claim than other creditors of the same class, compared with unsecured or general creditors.

The Bankruptcy Court focused on the February 6, 1974 transaction involving the transfer by Windor to the Malman Group of an additional ⅓ lien in the Pinnell Tract and the transfer of $25,000 cash. The Malman Group argues that the Bankruptcy Court should have taken into consideration a series of other transactions involving two additional parcels of land, 11 acres (hereinafter called the Building Tract) owned by S. A. Watson (an undivided ½ interest) and George Watson (an undivided ½ interest) and 38.20 acres (hereinafter called the McDavitt Tract) owned by S. A. Watson, trustee for the following beneficial owners: George Watson (an undivided ½ interest) and S. A. Watson (an undivided ½ interest). These two tracts and the Pinnell Tract (which was owned by S. A. Watson, trustee for the following beneficial owners: Windor Industries, Inc. (an undivided ⅓ interest), George Watson (an undivided ⅓ interest) and Windor Industries, Inc. Profit Sharing Trust (an undivided ⅓ interest)) had certain validly recorded liens thereon just prior to February 6, 1974:

(a) The building tract was burdened with a valid first lien in the original principal amount of $1,100,000 to Gibralter Savings & Loan, said lien placed for permanent financing of improvements;

(b) The McDavitt tract was burdened with a valid "purchase money" first lien established by the deed of trust dated December 3, 1970, executed by S. A. Watson, trustee, to Joe McNicholas, trustee, securing a note of even date therewith, in the original principal amount of $115,000.00, payable to the order of John F. Carssow, additionally secured by a vendor's lien retained in deed; and said tract was burdened with a valid "purchase money" second lien established by a deed of trust dated December 2, 1970, executed by S. A. Watson, trustee, to Carl Forsyth, trustee, securing a note of even date, in the original principal sum of $95,000.00, the note payable to the order of Jerome A. McDavitt, additionally secured by vendor's lien retained in deed;

(c) The Pinnell tract was burdened with a valid "purchase money" first lien established by a deed of trust dated October 2, 1969, executed by S. A. Watson, trustee, to Lynn E. Nicholson, trustee, securing the payment of one note of even date in the original principal sum of $81,000.00, executed by S. A. Watson, trustee, payable as therein provided to the order of A. Pinnell, Jr., J. W. Freeman, John W. Witt, and Mary John Barnett Kirkpatrick; said note secured by vendor's lien retained in the deed.

On November 22, 1972, the Malman Group and Windor entered into a loan agreement which provided:

(a) that the Malman group loan Windor $300,000.00;

(b) Windor deliver to the Malman group three subordinated promissory notes, each dated November 22, 1972, executed by Windor in the original principal amount of $100,000.00, with one note payable to the order of Virginal Capital Corporation, one note payable to the order of Sackman Gilliland Corporation and one note payable to the order of Jack Levine, Arthur Malman, and Benjamin Malman; and

(c) Each of these notes would be secured by a deed of trust dated as of November 22,

1972, executed by S. A. Watson, trustee, S. A. Watson and George S. Watson on the three tracts of land described above, granting the Malman group a junior lien "subject to" the above described liens on the building and McDavitt tracts, and on the Pinnell tract the Malman Group was granted a lien "subject to" the lien's undivided ⅔ interest owned by George Watson and Windor only; and

(d) The Malman Group would receive warrants to purchase common stock of Windor. Approximately one year after these transactions occurred in November 1972, Arthur Malman and Jack Levine pledged their interest in one of the $100,000 notes executed by Windor, which was jointly payable to the order of Arthur Malman, Benjamin Malman, and Jack Levine, to the New England Merchants National Bank; and the interest of Arthur Malman and Jack Levine in the deed of trust lien referred to above were transferred to the New England Merchants National Bank pursuant to a pledge agreement.

The Malman Group contends that on February 6, 1974 a series of inter-related conveyances occurred which did not, viewed as a whole, diminish the estate of the bankrupt. S. A. Watson and George Watson conveyed their interest in the McDavitt property and the Pinnell property to Windor in exchange for common stock of the company and the trust agreement was amended to recite Windor's new beneficial owner. Windor purchased for $50,000 the ⅓ undivided interest in the Pinnell tract held by the company's profit sharing trust and executed another amendment to the trust agreement to consummate this transaction. The National Bank of Commerce of Dallas loaned the sum of $650,000 to Windor and acquired a first lien mortgage on the McDavitt tract. Mr. McDavitt received $20,000 cash from the loan proceeds which was applied to this debt and the Malman Group entered into a lien subordination agreement by which their deed of trust lien securing the three $100,000 notes was subordinated to a new first lien in favor of the National Bank of Commerce of "up to $775,000", and a new second lien in favor of

McDavitt of $75,000 on the McDavitt and building tracts.

S. A. Watson, trustee on behalf of Windor, executed a deed of trust to Allen Feld, trustee, granting a lien on an undivided ⅓ interest in the Pinnell tract which secured the three $100,000 subordinated notes held by the Malman Group. Windor Industries, Inc. also paid $16,000 to be put in escrow to be paid to the Malman Group at the rate of $1,200.00 per month after August, 1974, in the event Windor did not sell the Pinnell tract by August, 1974. Finally, the $100,000 note executed by Windor payable to the order of Arthur Malman, Benjamin Malman, and Jack Levine, was broken down into three individual notes aggregating $100,000.

Through these transactions, McDavitt "spread" his second lien on the building tract ahead of the Malman Group, and also subordinated his lien position to the National Bank of Commerce on the "McDavitt Tract". The Malman Group "spread" its second lien on the Pinnell Tract to an additional undivided ⅓ interest and the trustee attacked this transaction as a preference and fraudulent conveyance. (The Malman Group was paid a subordination fee of $9,000 by Windor in the transaction).

*Findings of Fact By Bankruptcy Court*

The Malman Group contends that the bankruptcy court incorrectly singled out one element of an integrated series of transactions that occurred on February 6, 1974 in finding a preference and fraudulent conveyance. When viewed in totality, the Malman Group contends that the series of occurrences on February 6, 1974 did not diminish the assets of the bankrupt's estate but in fact increased the assets of the bankrupt's estate.

An appellate court may not set aside findings of fact made by a bankruptcy judge unless those findings are clearly erroneous. Bankruptcy Rule 810; *Martin v. Mercantile Financial Corporation,* 404 F.2d 886 (5th Cir. 1969); *Spack v. Strauss,* 373 F.2d 641 (5th Cir. 1967). The Malman

Group admits in one of its pleadings and this court concurs that "(i)t is apparent from a review of the statement of facts that the attorneys during the trial of the case did not consider that the February 6th transaction was an integrated multiple party transaction, because there was no direct questioning of any witness on the point". On appeal the Malman Group has constructed the case for the integrated transaction theory from various exhibits which indicate that the transactions occurred, and a variety of snatches of testimony and other documentary evidence which purportedly show that the events that occurred on February 6, 1974 were one integrated single transaction. None of the actual instruments of conveyance necessary to carry out the six steps of the so-called "one transaction" recites that the instruments were in fact executed in consideration of each other. The evidence cited by the Malman Group to support their "single transaction" theory at best shows that these transfers occurred on the same day and may have been related, but there is not enough evidence in the record for this court to make a determination that the bankruptcy court's findings of fact were clearly erroneous on this point; in fact, it would probably have been clearly erroneous for the bankruptcy court to conclude in reviewing the evidence before it that this was a single integrated transaction. The burden is on the Malman Group to show that the findings below were clearly erroneous, and not merely that the Court could have reached another conclusion based upon the testimony presented, *In Re Dolnick,* 374 F.Supp. 84 (D.C.Ill.1974), and they have failed to meet this difficult burden.

### Diminution of the Estate

■ The estate of the bankrupt must be depleted before a preference can occur. 3 *Collier on Bankruptcy* 846–847, § 60.19. *See also Cheek v. Beverly-Wilshire Properties, Inc.,* 103 F.Supp. 913 (S.D.Cal.1952), *Shafter v. Mooney,* 18 F.2d 836 (9th Cir. 1927); *Hough v. Atchinson, Topeka & Santa Fe Ry. Co.,* 34 F.2d 238 (10th Cir. 1929) (Payments received by the defendants in

these cases did not come from the bankrupt nor from any of the bankrupt's assets and therefore the courts found no preference because no diminution of the bankrupt's estate).

The Malman Group argues that *Cheek, Shafter* and *Hough* stand for the proposition that because the allegedly integrated February 6th, 1974 series of transactions increased the assets of Windor, rather than diminishing the net worth of the debtor, no preference resulted.

■ The Malman Group's contention that there was no diminution of the estate fails in this case. The bankruptcy court found, and I concur, that the transactions that occurred on February 2, 1974 were not integrated. There was a diminution of Windor's estate as can be seen from reviewing the findings of the bankruptcy court due to the transfer of the second lien deed of trust interest on a ⅓ interest in the Pinnell tract and the sum of $25,000 cash to the Malman Group, and therefore I must reject this point on appeal.

### Insolvency Testimony

The Bankruptcy Court found, as one of its findings of fact (FF. 5), that the Bankrupt was insolvent on or about February 6, 1974. The Malman Group argues that the Bankruptcy judge relied in large part on the testimony of an accountant, Travis Sullivan, in making his insolvency determination, and that that testimony clearly indicates that the accountant used incorrect calculations in computing the worth of the company. The Malman Group also contends that the accountant, and the court, used an incorrect standard in valuing the company, and that the accountant was not personally familiar with the company's situation.

The records of the Bankrupt were produced and shown to the Bankruptcy judge, and though the entire system of records were not marked as exhibits, significant items were included as a part of the record. The Bankrupt's own books and records reflect that Windor had been insolvent for

some time, see Balance Sheets of November 30, 1973 (Trustee's exhibit 7, p. 399–401), Balance Sheet of December 31, 1974 (Trustee's Exhibit 8, p. 399–401), and Balance Sheet of January 31, 1974 (Trustee's Exhibit 6, p. 346).

The Bankruptcy judge did not rely solely on these figures, as he also had, as pointed out by the Malman Group, the testimony of accountant Sullivan. Sullivan reviewed the books and records of the company, the company's prepared Financial Statements, reviewed outside records on the collection history of the Bankrupt's accounts receivable, M.A.I. appraisal reports on the Bankrupt's real estate and talked with the Bankruptcy Trustee in making his evaluation; in short, the accountant made a thorough and comprehensive review of the pertinent data and information available in arriving at his conclusions.

In *Mizell v. Phillips*, 240 F.2d 738 (5th Cir. 1957) the Fifth Circuit held that it is proper for a Bankruptcy Court to consider what a bankrupt's property brings at a Trustee's sale in making a valuation for purposes of determining insolvency. Sullivan could therefore have valued the Bankrupt's inventory at $\frac{1}{10}$ of what it was carried on the books (as that was the selling price) but instead valued the inventory at 6 times the selling price for reasons set forth in his testimony. These reasons included problems that Arthur Malman admitted he learned in January-February 1974, such as write-downs of raw material and finished goods inventory that had not taken place (Trustee's Ex. 2), depressed market condition for Windor's products (Plaintiff's Exhibit 19), and obsolete inventories or deteriorated inventory, (Trustee's Ex. 5).

A few other items are challenged by the Malman Group. A furnace of Windor's was bought for approximately $400,000 but was carried on the books at over twice that amount. Sullivan valued the furnace at $382,814, and the Malman Group's evidence indicates that this valuation was reasonable in light of the significant problems experienced with the furnace. In addition, the Bankrupt's records indicate the company was contemplating a $465,000 write-down on the furnace, and after bankruptcy, the Trustee was unable to sell the furnace and it had to be abandoned.

■ The Bankrupt's accounts receivable were valued by Sullivan at $644,000 when they had a book value of $760,773 on a total of 196 accounts. The accountant apparently relied in part for his analysis of the accounts receivable on information received from Commercial Credit Corporation. The Malman Group notes that this case was tried before the introduction of the new Federal Rules of Evidence, and therefore Sullivan was relying on hearsay. My reading of the testimony, keeping in mind the heavy burden of proof that the Malman Group must overcome, is that Sullivan did not rely entirely on the CCC appraisal, but used it to verify his own conclusions. Again, Arthur Malman supports the conclusions reached by Sullivan, in that it was noted that certain of the Bankrupt's receivables were from customers whose businesses were approaching insolvency, the collectibility of certain of the Bankrupt's receivables was being questioned, and sales were being made to weak customers. (Trustee's Ex. 2, 5). I find that the Bankruptcy Court did not err in making its determination on the assets of the company and their valuation.

■ The Malman Group finally objects that the Bankruptcy Court utilized the wrong standard in evaluating the value of the business, arguing that the business should have been valued at its "going concern" value. The fact that a company is nominally in existence is not persuasive in valuing the company at a "going concern" valuation, *Mitchell v. Investment Securities Corp.*, 67 F.2d 669 (5th Cir. 1933), and where the company is on its deathbed, the "going concern" value does not apply. *Langham, Langston & Burnett v. Blanchard*, 246 F.2d 529 (5th Cir. 1957). The evidence in this case supports the conclusion that Windor was exactly in this precarious situation on February 6, 1974 as substantial amounts of payables were overdue more than 60 days, the bankrupt owed approximately 1.5 mil-

lion to nearly 200 creditors, substantial inventories were obsolete or deteriorating, accounting figures for 1973 showed losses of nearly $400,000 and 1974 losses were estimated during the first 4 months of that year at $300,000, and key raw material vendors had cut off the company from its sources of supply. Thus I conclude that the Bankruptcy Court was correct in its factual and legal conclusions on these questions.

*Creditors of the Same Class*

One of the requirements of Section 60(a) of the Bankruptcy Act (11 U.S.C. § 96(a)) is that to find a preference there must be a transfer the effect of which will be to enable a creditor to obtain a greater percentage of his debt than some other creditor of the same class. The Bankruptcy Act does not define the word "class" in the definition section of the Act (Bankruptcy Act § 1, 11 U.S.C. § 1), and although the lack of a definition has created a serious gap in understanding what constitutes a preference, this void of knowledge has produced few decisions clarifying the definition of "class".

The Bankruptcy Court, on this point, held as follows:

> Under *Swarts v. Fourth National Bank* (CCA 8th), 117 F. 1, and *Livingston v. Heineman*, (CCA 6th), 120 F. 786, it is clear that in referring to the advantage of the creditor allegedly preferred over some other creditor of the same class, § 60 of the Bankruptcy Act is referring to the § 64 grouping of creditors into classes for purposes of relative priority on distribution of a debtor's estate, and the Malman Group, though holding security, is considered with the general creditors of the estate.

*Swarts* and *Livingston*, upon close analysis, do not stand for the proposition that secured and unsecured creditors are in the same "class" for purposes of § 60 of the Act. In *Swarts* the Eighth Circuit held that a bank whose claim was "secured" by the mere endorsement or guaranty of one or more third persons was in the same class as those creditors whose claims were not so "secured". The Sixth Circuit in *Livingston* held that a bank whose claim was guaranteed by a surety was in the class of "general or unsecured" creditors, and that the claim of the surety against the principal debtor for reimbursement of monies paid to the bank in discharge of his obligation, belonged to the same class, since the surety who so discharged the debt became subrogated to the rights of the creditor bank. A "secured" creditor is defined by the Bankruptcy Act as a "creditor who has *security* for his debt *upon the property of the bankrupt* of a nature to be assignable under the Act or who owns such a debt for which some endorser, surety, or other person secondarily liable for the bankrupt *has such security upon the bankrupt's assets.*" Bankruptcy Act § 1(28); 11 U.S.C. § 1(28) (Emphasis added). *Swarts* and *Livingston* both indicate that a creditor holding a debtor's note upon which there is an endorser or surety, not within the above definition, is *not* a "secured" creditor as a class is specified by the Act, although secured in a general sense by a personal guaranty. The banks in these two cases were not secured creditors, as that term is defined in the Act, and therefore were correctly placed in the class of "general or unsecured" creditors.

This conclusion is confirmed in *In Re Star Spring Bed Co.*, 257 F. 176 (D.N.J.1919), aff., 265 F. 133 (3rd Cir. 1920) where the court held that a creditor holding a debtor's note upon which there was an endorser or surety, not within the above definition of secured creditor, is not a "secured creditor" as defined in the Act.

*Swarts* discusses the term "class" and reaches the opposite result from that found by the Bankruptcy Court. There are three major classes of creditors affected by the Act: (1) statutory priority claimants (with 5 sub-classes); (2) secured creditors, and (3) general creditors.

> While it is true that the bankruptcy act does not define the word 'class,' nor in terms state what creditors are in the same class, it creates some classes, and specifies others, and it seems to us that the meaning of the word 'class' in the act

should, if possible, be derived from the statute itself. Section 64 . . . creates three classes of creditors,—parties to whom taxes are owing, employe's holding claims for certain wages, and those who, by the laws of the states or of the United States, are entitled to priority. Sections 56(b), 57(e), and 57(h) provide for the treatment and disposition of claims secured by property, and of claims which priority. The creditors who hold these various claims, and the general creditors of the estate, constitute the classes of creditors of which the bankrupt act treats." *Swarts v. Fourth National Bank*, 117 F. 1, 6 (8th Cir. 1902).

■ Section 56(b) of the Act singles out creditors who "are secured or have priority"; section 57(e) provides for temporary allowance of claims of "secured creditors and those who have priority"; section 57(h) relates to the determination of the value "of securities held by secured creditors" for the purposes of final allowance and payment of dividends; and section 64 creates five classes of creditors. Thus the Bankruptcy Act provisions support the idea that the Act contemplates three major classes of creditors when it refers to "class" in § 60, the preference provisions.

Recent commentaries on the preference provisions support the conclusion that there are three distinct "classes" of creditors affected by the Act, and that secured creditors are in a different class from the general or unsecured creditors. Cowan, in his Bankruptcy treatise, notes that there is no depletion of the estate of a creditor where a payment to a secured creditor frees property from the secured claim to the extent that the property was transferred, and thus, where the creditor is fully secured at the time of payment, there is no preferential effect. Cowan, BANKRUPTCY LAW AND PRACTICE, § 472 (1978). After reviewing all of the cases that relate to this question, Cowan concludes that "creditors who are fully secured on assets of the bankrupt are not in the classes of creditors intended in Section 60a." *Id.*

Professor Epstein, in his Nutshell on *Debtor-Creditor Relations* reaches the same conclusion, and raises the problem of where to place a creditor who is only partially secured. Epstein hints that in that situation he would conclude that a partially secured creditor is in the general creditor class to the extent that he is unsecured, and any allegedly preferential payments would pay the unsecured claim first. Epstein, DEBTOR–CREDITOR RELATIONS, pp. 216–223 (1973). Nadler also states that secured creditors constitute a separate class, and Countryman supports this position. Nadler, THE LAW OF BANKRUPTCY § 648; Countryman, Avoidance of Secured Transactions, 8 U.C.C.L.J. 315, 320–22 (1976). See also two recent bankruptcy court decisions on this question: *In Re Landry*, 1 Bank.Ct.Dec. 1087 (Vt.1975); *In Re Hall*, II Coll. Bank. Cases 1975, 448 (N.D. Miss.1974) (payments not preferential because no other secured creditors).

■ I find therefore that the Bankruptcy Court made an erroneous determination of law in lumping secured and general/unsecured creditors in the same class, and the Bankruptcy Court's finding that a preferential transfer occurred is reversed on that ground. I am not remanding for further consideration because, as stated below, I am affirming the Bankruptcy Court's determination that there was a fraudulent conveyance.

*Fraudulent Conveyance Under § 67*

■ A transfer may be both preferential and fraudulent, or it may be avoided as a preference alone or as a fraudulent conveyance alone. *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1916). The Bankruptcy Court, in addition to finding that the February 6 transaction was a preferential transfer, found that it was a fraudulent conveyance under Section 67 of the Bankruptcy Act, 11 U.S.C. § 107.

■ The Malman Group's points on appeal (diminution of the estate and creditor of the same class) are requirements for a preference only, 11 U.S.C. § 96, and therefore my finding that the Bankruptcy Court

utilized an incorrect definition of the "term" class in the preference provision of the Act has no effect on the Court's finding of a fraudulent conveyance.

Section 67 of the Act provides, among other things, that:

Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent.

A transfer, to be valid under section 67, must be for fair consideration and the transferee must have acted in good faith. *Bullard v. Aluminum Co. of America*, 468 F.2d 11 (7th Cir. 1972). Good faith is not present where the transferee at the time of the transaction had knowledge of facts sufficient to put him on inquiry as to the insolvency or possible insolvency of the debtor, *Davis v. Hudson Trust Co.*, 28 F.2d 740 (3rd Cir. 1928). It is clear from a review of the entire record, and the findings of fact and law by the Bankruptcy judge, that the Bankruptcy Court was correct in its conclusion, and not erroneous or clearly erroneous in its judgment, that bad faith was established and that the transfer was not for fair consideration.

I therefore conclude that the Bankruptcy Court was correct in its finding of a fraudulent conveyance.

The decision of the Bankruptcy Court is REVERSED IN PART and AFFIRMED IN PART.

It is so Ordered.